[Civ. No. 456.   Third Appellate District.—June 27, 1908.]

ALICE HEMENWAY, Administratrix, etc., of GEORGE W. PROCTOR, Deceased, Appellant, v. SABRINA L. B. ABBOTT, Respondent.

ACTION TO CANCEL DEED—FRAUD AND UNDUE INFLUENCE—SUPPORT OF FINDINGS FOR DEFENDANT.—In an action to cancel a deed from a deceased person executed to the defendant in his lifetime, on the ground of fraud, actual and constructive, and undue influence, where the court, upon issues fully joined thereupon, found upon sufficient evidence for the defendant, its findings will not be disturbed upon appeal, notwithstanding conflict in the evidence.

ID.—CONSTRUCTIVE FRAUD—PREVIOUS POWER OF ATTORNEY.—The mere circumstance that the grantor had previously executed a power of attorney to his grantee, under which she does not appear to have acted, does not necessarily make the deed to her constructively fraudulent. Even a gift by a principal to his agent may be valid, if the absolute good faith, knowledge and intent of both parties are clearly established.

ID.—RELATION OF PRINCIPAL AND AGENT—RULE AS TO DEALINGS—BURDEN OF PROOF UPON AGENT.—The agent and principal are not prohibited from dealing with each other; but in all their dealings respecting the subject matter of the agency the utmost good faith is required; and the burden of proof is upon the agent to show affirmatively that he acted in good faith, fairly and honestly. Where such proof is made, a deed from the principal to the agent will be sustained.

ID.—ABSENCE OF INDEPENDENT ADVICE—CAPABILITY OF INDEPENDENT JUDGMENT—INADEQUATE CONSIDERATION—CANCELLATION NOT WARRANTED.—Where there was evidence warranting the court in con-

cluding that both parties were in a situation to form an independent judgment, and that the grantor was capable of disposing of his property without the aid of an attorney or other independent advice, and that he called in a neighbor to witness the deed, and stated his reasons for executing it, neither the absence of independent advice, nor the mere inadequacy of consideration for the deed, or the fact that it was a gift, without other inequitable incidents, could warrant its cancellation, on the mere ground that the power of attorney created a confidential relation, necessarily requiring independent advice.

ID.—DISTINCTION AS TO INDEPENDENT ADVICE.—The cases where the courts have attached importance to the fact that the party alleged to have been overreached received no independent advice, are cases in which the recipient of such party's favor had some over-mastering influence, actual or presumptive, over the latter by reason of their natural relation, or because of some physical or mental infirmity by means of which the beneficiary was enabled to obtain an undue advantage. Such cases plainly turn upon the exercise of actual undue influence, and not upon any presumption of invalidity.

ID.—CONFIDENTAL RELATIONS—INDEPENDENT ADVICE NOT ALWAYS ESSENTIAL.—It is not essential in all cases of confidential relations, even where the utmost good faith is required to be shown to prevent undue advantage from unlimited confidence or affection, that before a transaction can be shown to be valid and binding, the confiding party must indispensably have had independent advice.

ID.—MENTAL WEAKNESS—CAPABILITY OF CONSENT.—The same rule that applies to a disposing mind and memory in the execution of a will, in a case of mere mental weakness, applies to conveyances and other agreements *inter vivos*. Mere weakmindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to his own free will, is not sufficient ground to defeat a contract, or to set aside an executed agreement or conveyance.

APPEAL from a judgment of the Superior Court of Kings County, and from an order denying a new trial. M. L. Short, Judge.

The facts are stated in the opinion of the court.

Lippitt & Lippitt, for Appellant.

Charles G. Lamberson, and Frank Lamberson, for Respondent.

CHIPMAN, P. J.—This action was brought to cancel a deed to certain real property, made by plaintiff's testate, George W. Proctor, to defendant. Judgment passed for defendant from which and from the order denying her motion for a new trial plaintiff appeals.

Plaintiff was duly appointed administratrix of the estate of said deceased, with the will annexed, and brings the action as such administratrix. She alleges in her amended complaint: That on May 5, 1904, the said Proctor was the owner of certain described real property situated in Kings county; that prior thereto, to wit, on July 29, 1903, the said Proctor executed and delivered to defendant his power of attorney "to sell or negotiate for sale or rent," the said lands above referred to and also certain other lands situated in San Luis Obispo county; that said power of attorney "was in full force and effect on said 5th day of May, 1904." The foregoing facts are found by the court to be true.

It is then alleged that on said May 5, 1904, said Proctor conveyed to defendant by an instrument, purporting to be executed by him, the said Kings county land in which said deed is also described the said land situated in San Luis Obispo county; that on said May 5, 1904, the said Proctor was of the age of eighty-one years, and "was then and for many years prior thereto had been infirm in body and mind"; that he was practically deaf, blind in one eye and the sight of his other eye greatly impaired; "that he was easily influenced by flattery, especially at the hands of women, and was by reason of age, infirmities and mental weakness unfit to transact business"; that defendant, "well knowing the condition, mental and physical, of said George W. Proctor, and at a time when she was occupying toward him the confidential and fiduciary relationship of his agent as aforesaid, did prepare or cause to be prepared, and did, by and through undue influence and for the purpose of benefiting herself, and for illegal and unlawful purposes and objects, cause, compel and have said George W. Proctor execute, acknowledge and deliver to her, said defendant, a certain instrument of writing, purporting to be the deed of said George W. Proctor, conveying to said defendant the land hereinabove described, together with the said lands in San Luis Obispo County"; that said deed "was made . . . if at all, by said Proctor to said de-

fendant for a grossly inadequate consideration, to wit, the sum of ten dollars; that no other or further consideration was paid to or received by said Proctor for said purported deed''; that said lands described in said deed are of the value of $2,000, and that the said consideration was fictitious and was, as plaintiff is informed and believes, afterward returned by said Proctor to defendant; that the said deed is void and a nullity ''for the reason that the same was made . . . if at all, for the purpose of creating and upon certain secret trusts, and to be held, retained and used for the use of said George W. Proctor and to enable said Proctor to sell, handle and dispose of said premises through and by his said agent, Sabrina L. B. Abbott''; that the said deed is void because the purposes for which it was made are not expressed therein; and is void because executed ''by reason of the undue influence of said defendant over said Proctor, for a grossly inadequate consideration, through the fraud, importunities and duress of said defendant, and for unlawful and illegal purposes and objects''; that said deed was executed by said Proctor, ''if at all, wholly without advice or assistance of counsel or relatives, and wholly by the direction, assistance and advice of the defendant''; that defendant has never carried into effect the objects for which said deed was executed, and it is now impossible for her to do so. The foregoing are substantially all the averments constituting plaintiff's cause of action.

Defendant answered the complaint without demurring thereto, and denied specifically plaintiff's averments of said Proctor's mental and physical incapacity; denied that he was induced to make said deed through the undue influence, fraud and like alleged influences of defendant; denied that the consideration for said deed was fictitious or grossly inadequate, or was upon any secret or other trust or purpose other than expressed upon its face, or was made for the benefit of said Proctor; averred that said deed was made without any undue influence exercised by said defendant and without any fraud, and for the sole and only lawful purpose of conveying title to defendant to the property therein described.

The court made findings negativing all the alleged facts set up by plaintiff as ground for the cancellation of said deed and made findings affirming the truth of defendant's allegations. The findings are challenged as unsupported by the evidence

and it is also claimed that the findings do not support the judgment.

We learn nothing of Mr. Proctor's life from the evidence prior to 1902 nor as to his characteristics, mental or physical. Defendant was said to be related (a cousin) to the second deceased wife of Proctor, and is first mentioned in connection with his family when she visited at Petaluma a daughter of Mrs. Hemenway in the latter part of 1902. Proctor was living with his daughter, Mrs. Hemenway, at that time. Mrs. Hemenway testified that defendant came to her house quite often: "She treated my father very pleasantly during that time. At first she did not treat him in any way that a mere acquaintance would not; only toward the last it was different. She would some to the door and ask where he was; he would be puttering around; I had two and a half acres of ground and she would go out where he was and talk with him." She was asked if she ever saw her "display any marks of affection for him at that time" and answered: "I have seen them stand in the yard with her arm over his shoulder." This is the extent of her exhibitions of affection toward him at Petaluma, or elsewhere for that matter, so far as appears. The witness testified that her father and defendant went to San Francisco "several times and were gone a couple or three days and then came back." It appeared that about this time, in the early part of 1903, defendant took a lodging-house in San Francisco and these visits may have had something to do with that; the evidence furnishes no other probable explanation of the purpose of the visits, for it will not be presumed and is not suggested by plaintiff that they had an immoral purpose, and the evidence shows that he took considerable interest in defendant's establishing a lodging-house in San Francisco. The witness testified that her father left her house in March or April, 1903, "just simply because he preferred to live in the city; he could not see very well and he could see things in the city that amused him. . . . He did not have any means to invest in a lodging-house at the time he went to San Francisco; nothing that could buy a lodging-house; he had a little money that my brother Frank sent him." It appeared that Mrs. Hemenway called to see her father while he was lodging at defendant's house and was shown her father's room by defendant with whom she said

"the conversation was on general lines." Her father visited her several times, she testified, after he went to San Francisco. Of the condition of his mind, in reply to a question, she testified: "Well, I think like anything that is growing old, or any old person; it wasn't what it should be. One of his hobbies was trying to appear young and agile." She said he had the hobby of trying to live on five cents a day when there was no necessity for it; another was to answer patent medicine advertisements.

The record discloses no evidence whatever in support of the alleged menace, duress and force as operating causes leading up to the deed from Proctor to defendant; nor is there any evidence of actual fraud surrounding the execution of the deed, unless it can be found in the facts and circumstances brought into the case in support of the alleged undue influence. Such influence is a species of fraud when exercised in the accomplishment of an unconscionable and unfair advantage over the person upon whom it operates. Considering this feature of undue influence, and apart from the constructive fraud arising alone out of the admitted pre-existing agency, we think there is evidence justifying the findings of the court upon it.

Bearing upon the question, it is claimed that Proctor was old and physically infirm; that he was susceptible to flattery, especially at the hands of women; was deaf and practically blind; incapable of transacting business by reason of weakness of mind; and that he executed the conveyance involved without independent advice and for an inadequate consideration. Upon all these points except as to his age the court found against plaintiff's contention.

The witnesses all agree that Proctor was physically very active, unusually so for a man eighty-one years old. He suffered from asthma but otherwise his health was unimpaired. His ailment did not prevent his taking active exercise, nor did it affect his mind or weaken him physically to any extent. He was not deaf but "was quite hard of hearing." Witnesses for both parties, however, testified to conversations with him carried on apparently without much difficulty. He was practically blind in one eye, but the evidence was that he could read and did read books and the newspapers and wrote letters, and found his way around the streets of

San Francisco alone and unaided. He met his death by being run over by a street-car when he was out sight-seeing and taking exercise in that city. There is no substantial conflict in the evidence as to the foregoing facts and they may be at once dismissed from further consideration.

His son in law, Overton, testified that Proctor "was a man susceptible of being led or influenced, very easily; flattery would lead him almost anywhere." On the contrary, witness Mrs. Barnes testified that "he was stubborn; anything he made up his mind to do he would do, and anything he made up his mind not to do, he would not do. He was very obstinate; in fact, he prided himself on being so. He often told me that no one could influence him to do anything that he did not want to do." Witness Overton was asked his opinion as to whether Proctor was a person easily influenced by women, but the court sustained an objection to the question as not within any of the material issues in the case and there was no evidence upon the point. Overton, however, was permitted to testify that his "general conversations seemed to dwell upon women—upon sexual intercourse with women. He stated to me that when he had passed that condition he was ready to die." If this testimony had any pertinence, it goes to show physical vigor in the old man. There was not the slightest evidence of any immoral relations between him and the defendant. He frequently said that she took good care of him and made her house a comfortable and very agreeable home for him, and that he was happier and more contented there than when living with his daughter at Petaluma. But the law is not so uncharitable as to attribute sinister and fraudulent motives to what appeared to be simple acts of kindness and consideration. Nor will the law compel the inference that, because he chose to reward her considerate treatment he did so while under some undue influence exerted by defendant, and that this influence was the moving cause for the reward bestowed. His daughter, Mrs. Hemenway, called upon defendant while he was living at defendant's house and was shown his room. If she discovered any evidence of defendant's unusual influence over him it does not appear. His daughter in law, Mrs. Frank Proctor, had some knowledge of the way he was living while with defendant and of the treatment he received at her hands. She wrote

defendant a letter dated March 22, 1904, addressing her as
"Dear Cousin," saying, among other things: "I thought
when you so kindly wrote me of our dear father's safe ar-
rival there that I would write you at once, but so take the will
for the deed and here I am to thank you for your many kind-
nesses to father. I don't think I would have tried to write you
after so many months of delay only father in his last letter as
good as said he was on one of his pet fits of starving and I
want you to see he gets everything he needs. I am going to
send the check to you and you keep out enough to board him
well say twenty per month would buy and pay you for cook-
ing for him. I know money could not pay for the atten-
tion you give him and kindness can't be paid for. . . . I am
glad father has the home he has, for I could not do for him
as you do and he has no amusement here. . . . Lots of love
to you both. . . . Now write me soon and believe me your
friend and cousin. Mrs. Frank L. Proctor." This letter
was written a few months after Proctor had returned from
Cananea, Mexico, where he had been visiting his son Frank.
Its statements are inconsistent with some of Mrs. Proctor's
testimony by which she seemed to place an entirely different
complexion upon the conduct of defendant toward her boarder.
The "pet fit" to which she alludes in the letter is explained
by her testimony and that of Mrs. Hemenway—that their
father had a notion that people ate too much, and that he
could prove it by living on five cents a day and retain his
strength.

There is very little testimony bearing upon Proctor's mental
condition. Witness Overton testified: "As to his mentality,
for an old man he appeared to be very bright, but sometimes
he appeared to be very childish, but as a general thing he
appeared to be very bright." The only business transaction
testified to in which Proctor was interested was a deal in
land and occurred in 1894 or 1895. This resulted in loss, but
it was not attributable to weakness of mind but rather to
mistaken judgment not unusual with men in perfect mental
health. In the later years of his life Proctor was not en-
gaged in any business and was supported by his children.

Proctor visited his son Frank in Mexico the latter part of
1903. Frank Proctor testified that in his opinion his father
was at that time "not competent to any extent to transact

business''; that he would not trust him ''with any amount of money to do business on.'' It appeared, however, that when he returned to San Francisco Frank and his wife gave the old man $780, for his personal use and purchased a return ticket for him. It would not necessarily follow from this opinion of Proctor's mental capacity to transact business ''to any extent'' that he could not, and did not, fully understand the nature of the transaction complained of, or that he was incapable of exercising a free and independent judgment concerning it.

Upon the question of independent advice there was no evidence that Proctor had any. The finding of the court is in accordance with the evidence that defendant prepared the deed at the request of Proctor, and that it was not made ''wholly or at all by the direction or advice of defendant.'' It appears from the testimony of Mrs. Barnes, who lived next door to defendant, that her husband was called in to witness the execution of the deed, and that Proctor, defendant and Mr. and Mrs. Barnes were present, and the deed shows it was ''signed, sealed and delivered'' in the presence of Barnes. She testified that the deed was not mentioned, but her husband did not witness the signature to the power of attorney and did witness the execution of the deed. Reading her testimony in its entirety, there can be no doubt but that it was the deed in controversy to which she referred. Mrs. Barnes testified that Proctor told her he wished to provide for Mrs. Abbott. ''He told me that she had made a home for him and made him much happier than he had been anywhere since his wife died, and for that reason and that she was not a very strong woman he wanted to provide for her as far as he could. He said, 'Mrs. Barnes, I did a good deal for my children when I had money and I think they should leave me alone and let me be where I am happy.' '' Her testimony shows that Proctor knew what he was doing and intended to do what he did in the matter. Mrs. Barnes testified further: ''Mr. Proctor was a very bright man and was at that time and up to the time of his death. I saw him daily and I considered him a very bright man for a man of his years. . . . He often told me that no one could influence him to do anything that he did not want to do.'' He lived at Mr. Barnes' house during the last month of his life and was stopping there when he

died. The court was justified, we think, from the testimony of this witness in concluding that Proctor was capable of disposing of his property without the aid of an attorney or other independent advice.

The money consideration paid, as shown by the deed, was but $10, but the court found on sufficient evidence that Proctor desired defendant "to have and to hold said real property described in said deed as her own property," in consideration also for the kind treatment he had received at her hands. Witness Overton was asked: "Did she (defendant) ever state to you what consideration she had given for these deeds, if any? A. As far as I can recollect she told me that it was simply conveyed to her for the purpose of getting a lodging-house; for the benefit of the two of them; she was to run the house and they were to have a kind of partnership." The trial court evidently accepted the more direct and positive testimony of Mrs. Barnes.

Witness Frank Proctor deposed to having received a letter from defendant "in the early part of 1903." He had not the letter but he deposed to its substance as follows: "Mrs. Abbott made me a proposition that if I would furnish money for her to buy a lodging-house in San Francisco that she would marry my father; that he had proposed to her and her proposition was to me that she would marry him and take care of him during his lifetime if I would furnish her this money for the lodging-house and allow her—provide for her after his death should he die first—during her lifetime—and then that this property would revert back to me." He answered that he "would not do anything; that he would always provide a home for his father." Later when his father visited him he testified that he showed this letter to him but did not remember what his father said about it. "He talked with me at that time about my furnishing money for a lodging-house in San Francisco. He approached the subject in some way, but I never would talk to him about it."

Mrs. Frank Proctor in her deposition also speaks of her father importuning her husband for money to buy a lodging-house in San Francisco, and she also testified to having seen a letter from defendant to her father in which defendant urged him "to bring back the money." What credence was given to this testimony by the trial court we cannot know. It bears

upon some phases of the case, but the circumstances occurred several months prior to the date of the deed in question, and it was some months later that Mrs. Proctor wrote the letter already referred to.

To one other circumstance, upon which appellant lays stress, our attention is especially invited. Proctor made an olographic will, couched in few words, on May 22, 1903, to which he appended a codicil on May 28, 1903. Appellant urges that this shows a recognition of his obligation to and affection for his children, and manifests his intention as to the disposition of his property. This will was executed about the time his daughter, Mrs. Hemenway, says he went to San Francisco and a year before he conveyed the property to defendant. As tending to show his state of mind toward his children or defendant a year later it has slight probative force. Indeed, it would be difficult to make much meaning out of his document because of its incoherency, except as an exhibition of illiteracy.

The learned trial court doubtless felt itself brought by the evidence to the consideration of the case in the light of the relation of principal and agent alone between Proctor and defendant, and as there was evidence justifying its conclusion, this court cannot interfere.

This relation is shown by a power of attorney given by Proctor to defendant which is dated July 29, 1903. It was duly acknowledged before Justin Gates, a notary at San Francisco, and appears to have been witnessed by him, but was not recorded. The circumstances under which this power was given do not appear, nor does it appear that defendant ever acted under it or made any effort to sell the property by virtue of it. It was in existence, however, when the deed in controversy was executed and delivered, and the court so found. The deed in question was executed May 5, 1904, was acknowledged at San Francisco before F. C. Ford, notary, on the same day and purports to have been "signed, sealed and delivered in the presence of R. L. C. Barnes." It was recorded at the request of defendant in Kings county on July 9, 1904, more than a month prior to Proctor's death, and manifestly not in anticipation of his death, for it occurred by accident.

We may with propriety state some of the principles applicable to cases of this character. The agent and his principal are not prohibited from dealing with each other, but the rule is that in all their dealings respecting the subject matter of the agency the utmost good faith is required; and the burden of proof is on the agent to show affirmatively that he acted in good faith, fairly and honestly. See the subject quite fully discussed and the authorities cited in *Curry* v. *King*, 6 Cal. App. 568, [92 Pac. 662].

"The rule is well settled that where the parties were both in a situation to form an independent judgment concerning the transaction, and acted knowingly and intentionally, mere inadequacy in the price of the subject matter, unaccompanied by other inequitable incidents, is never of itself a sufficient ground for canceling an executed or executory contract." (Pomeroy's Equity Jurisprudence, sec. 926.) "If there is nothing but inadequacy of price, the case must be extreme, in order to call for the interposition of equity." (Id., sec. 928.) The fact that a conveyance or other transaction was made without professional advice or consultation with friends, and was improvident, even coupled with an inadequate price, is not of itself a sufficient ground for relief, provided the parties were both able to judge and act independently, and did act upon equal terms, and fully understood the nature of the transaction, and there was no undue influence or circumstances of oppression. (Id., 928.)

"The equitable conception of true consent assumes physical power of the party, an intellectual and moral power, and that he exercised these powers freely and deliberately." It is difficult to formulate any rule determining the amount of mental weakness which will destroy the person's capacity to devise or convey property. The following has been adopted and is stated by Mr. Pomeroy to be clearly just: "Had the testator a disposing memory? Was he able, without prompting, to recollect the property he was about to bequeath, the manner of distributing it and the objects of his bounty? To sum up the whole in the most simple and intelligible form. Were his mind and memory sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed the will?" The same rule applies to conveyances and other agreements *inter vivos*. (Id.,

sec. 947, note 1.) "It is equally certain that *mere* weak-mindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not sufficient ground to defeat the enforcement of an executory contract or to set aside an executed agreement or conveyance." (Id.) "Undue influence and fiduciary relations constitute different doctrines." (Id., sec. 965.)

Equity treats the relation of principal and agent in the same general manner, though not with quite the same strictness, as that of trustee and beneficiary. In any contract of purchase or sale with the principal, or other transaction by which the agent obtains a benefit, a presumption arises against its validity which the agent must overcome, but this presumption is not so weighty or strong as in the case of a trustee. (Id., sec. 959.)

A gift by a principal to his agent may be valid and be sustained, if the absolute good faith, knowledge and intent of both parties is clearly established. (Id.)

With these principles in view, we think the findings of the trial court are supported by the evidence and that the findings support the judgment.

We discover no prejudicial error in any of the rulings of the court.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on July 27, 1908, and the following opinion was then rendered thereon:

CHIPMAN, P. J.—Petition for rehearing. The principal ground upon which we are asked to open the case is that it falls within the rule laid down by this court in *Nobles* v. *Hutton*, 7 Cal. App. 14, [93 Pac. 289], where the court said: "It is a well established principle that persons standing in a confidential relation toward others cannot entitle themselves to hold benefits which others may have conferred upon them, unless they can show to the satisfaction of the court that the

person by whom the benefits have been conferred had independent advice in conferring them." (Citing, also, *Yordi* v. *Yordi,* 6 Cal. App. 20, [91 Pac. 348].) It was said in *Robins* v. *Hope,* 57 Cal. 493, 497: "The phrases 'confidential relation' and 'fiduciary relation' seem to be used by the courts and law writers as convertible terms. It is a peculiar relation which undoubtedly exists between client and attorney, principal and agent, principal and surety, landlord and tenant, parent and child, guardian and ward, ancestor and heir, husband and wife (naming some others). In these and the like cases the law, in order to prevent undue advantage from the unlimited confidence, affection, or sense of duty which the relation naturally creates, requires the utmost good faith (*uberrima fides*) in all transactions between the parties." (1 Story's Equity Jurisprudence, sec. 218.) In *Scattergood* v. *Kirk,* 192 Pa. 263, [43 Atl. 1030, 1032], it was held that "the term 'confidential relation' is not confined to any specific association of the parties to it. While the most frequent illustrations are between persons who are related as trustee and *cestui que trust,* guardian and ward, attorney and client, parent and child, husband and wife, it embraces partners and copartners, principal and agent, master and servant, physician and patient, and generally all persons who are associated by any relation of trust and confidence." As further illustrating the meaning of these terms, it was held in *Thomas* v. *Whitney,* 186 Ill. 225, [57 N. E. 808, 810], that "the relation exists and relief is granted in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations, and those informal relations which exist wherever one man trusts in and relies on another."

Assuming that the power of attorney given to plaintiff by Proctor created a confidential relation between them in respect of the property, it does not necessarily follow that the principal could not sell or give the property to the agent except under the guidance of independent advice. The cases where the courts have attached importance to the fact that the party, alleged to have been overreached, received no independent advice, are cases in which the recipient of such party's favor had some over-mastering influence, actual **or**

presumptive, over the latter by reason of their natural relation or because of some physical or mental infirmity by means of which the beneficiary was enabled to obtain an undue advantage. For example, where a child under majority conveys valuable property to the parent or releases his interest in some expectancy of value "the law," as said by Judge Story, "in order to prevent undue advantage from the unlimited confidence, affection, or sense of duty which the relation naturally creates, requires the utmost good faith in all transactions between them," and the absence of independent advice in such case might be given special significance. So, also, where the relation is that of husband and wife. But we do not think that it has ever been held that before such a transaction can be shown to be valid and binding it must appear in every case as indispensable that the child or wife had independent advice. *Nobles* v. *Hutton*, 7 Cal. App. 14, [93 Pac. 289], and *Yordi* v. *Yordi*, 6 Cal. App. 20, [91 Pac. 348], were cases where the court, because of the peculiar relationships of the parties, and the circumstances shown, attached special significance to the failure to show that the persons conferring the benefit acted under independent advice. But it was not intended to lay down the hard-and-fast rule that under no state of circumstances can a conveyance made by a minor child to his parent or wife to her husband be upheld unless it be shown to have been executed upon independent advice. An examination of the case of *Nobles* v. *Hutton, supra,* will show that the principle above quoted was enunciated with reference to the peculiar and controlling circumstances of the case. So, also, was it in *Yordi* v. *Yordi, supra.* The rule certainly cannot be more rigid when applied to the ordinary relation of principal and agent. To show that the principle contended for does not necessarily apply in all cases where the relation, for example, is that of parent and child, let us suppose a conveyance by the parent to his child. Here we have the relation, but the situation of the parties to the transaction is reversed and the rule would not ordinarily apply. Yet it might appear that the parent was of great age and of weak mind; that the child had the power to, and in fact did, exercise undue influence over his parent and that these facts and other circumstances attending the transaction would require that the act of the parent should be shown to have been performed under the direction of independent ad-

vice, i. e., by some impartial person or persons. Speaking of gifts by a child to a parent, Mr. Pomeroy says: "The law on the subject is well settled. A child makes a gift to a parent, and such a gift is good if it is not tainted with parental influence. A child is presumed to be under the exercise of parental influence as long as the dominion of the parent lasts. Whilst the dominion lasts it lies on the parent maintaining the gift to disprove the exercise of parental influence, by showing that the child had independent advice, *or in some other way*. When the parental influence is disproved, or that influence has ceased, a gift from a child stands on the same footing as any other gift; and the question to be determined is, whether there was a deliberate, unbiased intention on the part of the child to give to the parent. Where the positions of the two parties are reversed, where the parent is aged, infirm, or otherwise in a condition of dependence upon his own child, and the child occupies a corresponding relation of authority, conveyances conferring benefits upon the child may be set aside. Cases of this kind plainly turn upon the exercise of actual undue influence, and not upon any presumption of invalidity." (2 Pomeroy's Equity Jurisprudence, sec. 962, and note 3.) In the present case there is but slight if any evidence of actual undue influence exercised by plaintiff over Proctor. Aside from her personal attention to his wants, in a way to excite in him a sense of gratitude for her kindness, there is little if any evidence, and in this treatment no ulterior motive to possess his property is shown. His manifestation of trust and confidence in her is shown by the power of attorney to sell the property, but that she had some over-mastering power over him or could unduly influence him in matters of business there is no evidence. The witness Overton testified that she told him the property "was simply conveyed to her for the purpose of getting a lodging-house; for the benefit of the two of them; she was to run the house and they were to have a kind of partnership"; but this was in conflict with other evidence, and the trial court did not accept this as a statement to be believed, or, at least, as affecting the conviction of the court based upon the testimony of Mrs. Barnes and other evidence in the case.

It is further urged as ground for a rehearing that the court failed to comment upon the fact that defendant did not tes-

tify in the case. Why she was not called as a witness does not appear. It would doubtless have been more satisfactory had she made a full explanation of her relations with Proctor, but it cannot be said, as matter of law, that her failure to testify destroyed the probative force of the evidence submitted in the case in her behalf.

. We are unable to discover sufficient ground for granting a rehearing, and it is therefore denied.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 24, 1908.