[Civ. No. 5449. First Appellate District, Division One.—December 16, 1926.]

# FRANCIS J. HENEY, Respondent, v. MARY A. HENEY et al., Appellants.

[1] AGENCY—POWER OF ATTORNEY — FIDUCIARY RELATION — BREACH — FRAUD.—The acceptance of an agency under a power of attorney in itself establishes a relationship fiduciary in character between the principal and agent, which holds the agent to a high standard of good faith, full disclosure, and absolute disinterestedness pertaining to the particular agency created, and a breach of the duties thus imposed amounts to constructive fraud; but a case of constructive fraud in connection with the purchase, at foreclosure sale, of certain real property, cannot be predicated alone upon the asserted violation of any fiduciary duty arising by operation of law from the agency defined by the express terms of a power of attorney, where that instrument merely authorizes the agent to sell a quantity of wine situated on said real property and with the proceeds derived from the sale to pay certain debts, including the indebtedness for which the property was sold on foreclosure, and the wine is not sold.

[2] ID. — SCOPE OF AGENCY — EVIDENCE — FINDINGS. — In this action in ejectment, in which the defendants denied plaintiff's ownership of the land and, by answer and cross-complaint, pleaded equitable defenses that plaintiff acquired the property through fraud growing out of an alleged trust relationship, the evidence was sufficient to justify the findings of the trial court that the power of attorney executed to plaintiff to sell certain wine did not create an agency more extensive in its scope than the one indicated by the terms of such instrument, and that plaintiff made a full and complete disclosure in good faith of his intention to acquire the land in question in his own interests in the event of a sale thereof.

[3] ID. — SUBJECT MATTER OF AGENCY — DEALINGS OF AGENT — GOOD FAITH — DISCLOSURE OF INTENTIONS. — The mere execution of a power of attorney does not prohibit an agent from dealing with the subject matter of the agency, provided he acts in good faith, fairly, and honestly, and makes full and seasonable disclosure of his intentions to do so.

[4] ID. — FORECLOSURE SALE — PURCHASE BY JUNIOR ENCUMBRANCER— LIMITED TITLE—REDEMPTION.—The relation between a mortgagor and mortgagee is not fiduciary; and, upon a foreclosure sale under a deed of trust constituting a first lien, and a purchase of the

1.  See 1 Cal. Jur. 789; 21 R. C. L. 824.
3.  See 1 Cal. Jur. 800; 21 R. C. L. 830.

property by a junior encumbrancer, the title acquired is not
limited and the debtor is given no right of redemption.

[5] ID.—EJECTMENT—EQUITABLE DEFENSES—JURY TRIAL.—In an ac-
tion in ejectment, where the defendants deny plaintiff's ownership
of the land and, by answer and cross-complaint, plead equitable
defenses that plaintiff acquired the property through fraud grow-
ing out of an alleged trust relationship, and the issues raised by
such defenses are purely equitable, defendants are not entitled
as a matter of right to a trial by jury thereon.

---

(1) 2 C. J., p. 692, n. 16, p. 693, n. 23.   (2) 2 C. J., p. 952, n. 64,
p. 953, n. 68, p. 956, n. 86; 4 C. J., p. 900, n. 98.   (3) 2 C. J., p. 709,
n. 46.   (4) 41 C. J., p. 283, n. 47 New, p. 602, n. 86; 42 C. J., p. 380,
n. 92 New.   (5) 35 C. J., p. 175, n. 16.

APPEAL from a judgment of the Superior Court of
Santa Clara County.   F. B. Brown, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Maurice E. Harrison, Brobeck, Phleger & Harrison,
Henry Brown and C. C. Coolidge for Appellants.

Frank H. Benson, Louis Oneal, Wm. F. James, E. M.
Rea and B. D. Townsend for Respondent.

KNIGHT, J.—Appellants herein, Mary A. Heney and
Edwin A. Heney, prosecute this appeal from an adverse
judgment in an action in ejectment brought by respondent
to obtain possession of a tract of land in the Santa Clara
Valley, and for the mesne profits thereof and damages on
account of waste alleged to have been committed thereon.

Appellants are the widow and surviving son, respectively,
of Richard J. Heney, Jr., deceased, a half-brother to re-
spondent.   The land in question, containing 100 acres
planted mostly to vineyard, was owned by Richard J.
Heney, Jr., and operated by him for the production of wine
from 1882 until the date of his death in 1919, at which
time his surviving wife, the said Mary A. Heney, succeeded
to his interests, and thereafter and until the date of the
entry of judgment herein the property was managed by the
said Edwin A. Heney.

---

5.   See 15 Cal. Jur. 338.

Respondent purchased the property on August 9, 1922, for the sum of $37,496.39 at a trustee's sale conducted under the terms of a deed of trust held by R. M. Wright, as executor, to secure payment of a loan amounting to more than $35,000, respondent at the time of sale being the owner and holder of a junior deed of trust given to secure the payment to him of the sum of $61,119.91 and interest, upon which there was due upward of $80,000. Respondent purchased the property with funds obtained from the First Federal Trust Company of San Francisco, through the medium of a loan made to him in the sum of $40,000, payment thereof being secured by the property about to be purchased. A few days subsequent to the foreclosure sale respondent consented to resell the property to Mrs. Heney, and on November 23, 1922, gave a written option to that effect, but afterward revoked the option and commenced this action.

Appellants denied respondent's asserted title as owner, and by answer and cross-complaint set up equitable defenses charging respondent with having acquired the property through actual fraud growing out of an alleged trust relationship, the substance of the allegations relating thereto being that when the foreclosure of the Wright deed of trust became evident, respondent, a lawyer of prominence and experience, sustaining toward Richard, during his lifetime, and after his death toward the members of his family, fiduciary relations founded upon mutual confidence and an affectionate family association of many years' standing, lulled appellants into the security that with the aid of a personal friend, Mr. Rudolph Spreckels, a banker connected with the First Federal Trust Company, he would prevent a loss of the property to Mrs. Heney at trustee's sale by obtaining a bank loan for her; and that, furthermore, on June 12, 1922, due to the trust and confidence reposed in him by Mrs. Heney, obtained from her a power of attorney, authorizing him to sell a large quantity of bonded wine which had been produced on the property, and shown by the evidence to be of the estimated worth of $40,000, one-half of which was subject to a chattel mortgage given for the principal sum of $5,000 to one Steinfeld, and with the proceeds of the sale to pay the Steinfeld and Wright indebtednesses, and any excess to Mrs. Heney; that

shortly prior to the date of the foreclosure sale respondent falsely represented that owing to a question of title the bank required as a condition to granting said loan that the loan transaction be consummated with him personally, and that he take title at the sale in his name; but that respondent further represented that in doing so he would still be acting in the interests of Mrs. Heney with no intention of acquiring the property for himself and would convey the same to her on demand; that Mrs. Heney, being thus lulled into security, made no independent effort to obtain funds to avert a loss of the property, but, on the contrary, assisted respondent in obtaining said loan, and permitted him to purchase said property in his own name as sole bidder therefor, being unaware of his intention to permanently deprive her of the property until October 22, 1922. Appellants therefore claimed that respondent's title was merely that of a trustee, which gave appellants the right to continue in possession and also the right to redeem.

Respondent denied the accusations of fraud and the existence of confidential relations at the time of the impending sale. He also denied that he had practiced any deception or concealment whatever as to his intentions to acquire the property in his own interests, but alleged that, on the contrary, he had repeatedly warned appellants over a period of several months that if the Wright loan was not taken care of by them and a foreclosure sale resulted, he would be compelled, in order to protect his own rights under the second deed of trust, to borrow the money personally and bid in the property, in which event he would retain title and take possession. Regarding said power of attorney, respondent alleged that the debt secured by the Steinfeld chattel mortgage was about due and its payment was guaranteed by him; that since appellants had been unable to sell said wine his object in obtaining said power of attorney was to dispose of the same, if possible, prior to the foreclosure sale, with the hope of securing enough money to extinguish the Steinfeld and Wright indebtednesses, thereby giving his junior deed of trust priority as a first and superior lien; but being unable to sell the wine, he so notified appellants on July 22, 1922, and thereafter borrowed the money on his own account to bid in the property.

The equitable issues thus presented were tried by the court sitting without a jury, and findings were made absolving respondent as to all charges of fraud, the court in its decision having followed substantially the denials and the allegations of the answer to the cross-complaint. Thereupon a jury trial was had of the legal issues, but claims for waste and mesne profits having been abandoned, a directed verdict was rendered in favor of respondent for the possession of the premises, and judgment was entered in accordance with said findings and verdict.

Appellants concede that in so far as the question of actual fraud is concerned, the decision of the trial court is conclusive, the findings exonerating respondent as to the allegations of specific misrepresentations being based upon conflicting evidence and therefore unassailable on appeal; but they now seek to segregate the transaction involving the execution of said power of attorney from the charge of actual fraud as pleaded by them, and again urge said transaction as the basis of a charge of constructive fraud, contending that the sole purpose of granting said power of attorney was to prevent a loss of the property to Mrs. Heney at foreclosure sale and that therefore the effect of the execution of said instrument was to create an agency which by implication of law imposed upon respondent as agent the duty of protecting Mrs. Heney's interests alone as to all matters connected with the sale of said property and precluded him while said agency existed from acquiring the property in his own interests or from gaining any personal advantage as a result of said sale; that during the pendency of said agency respondent, contrary to the obligation of his trust, purchased said property at foreclosure sale in his own interests, the purchase being attended by circumstances showing, as appellants claim: "(1) a grossly inadequate price; (2) a lulling of the principal into security; (3) a failure until too late to report a lack of success in securing the object of the agency, and (4) the securing of an advantage at foreclosure sale by procuring a renewal" of the debt secured by his junior deed of trust, which respondent had inadvertently allowed to become outlawed. In other words, it is claimed in substance that without having terminated said agency by any clear disclaimer and without notifying Mrs. Heney of the failure to

sell the wine until it was too late for her to save the property from foreclosure sale through her own efforts, by affecting a sale of said wine or the real property or both, respondent, under circumstances showing that Mrs. Heney was lulled into security, purchased said real property in his own interests, for a sum grossly disproportionate to its value; and as an additional advantage gained has been allowed to continue in force against Mrs. Heney the obligation to pay the full amount of indebtedness previously secured by the junior deed of trust. Appellants therefore contend that regardless of the findings on the issues of actual fraud, a case of constructive fraud has been established as a matter of law, based upon the agency created by the execution of said power of attorney, which cast upon respondent the obligation to restore to Mrs. Heney as prayed for in her cross-complaint the legal title to said property, subject to the imposition of the usual equitable conditions.

[1] It is doubtless the law, as appellants contend, that the acceptance of an agency under a power of attorney in itself establishes a relationship fiduciary in character between the principal and agent, which holds the agent to a high standard of good faith, full disclosure and absolute disinterestedness pertaining to the particular agency created, and that a breach of the duties thus imposed amounts to constructive fraud; but it is apparent that here a case of constructive fraud cannot be predicated alone upon the asserted violation of any fiduciary duty arising by operation of law from the agency defined by the express terms of the power of attorney now before us, because that instrument merely authorized respondent to sell a quantity of wine and with the proceeds derived from the sale to pay certain debts; and since the wine was not sold it cannot be held that there has been any breach of fiduciary duty relating to the subject matter of that particular agency.

[2] Appellants contend, however, that the result of the execution of said power of attorney was to create an agency more extensive in its scope than the one indicated by its terms—one whereby respondent, being Mrs. Heney's confidential advisor, lulled her into the security that by granting said power of attorney he would avert a loss of the property to her at said sale. It will therefore be seen that

the agency now contended for by them as having been created as the result of the execution of said power of attorney and which is now being urged as the basis of the case of constructive fraud is to all intents and purposes identical in its scope with the one heretofore urged by them as the basis of the case of actual fraud, and consequently, like in the latter case, must depend necessarily for its establishment upon extrinsic evidence. As already pointed out, the trial court concluded upon the evidence adduced that no such agency existed, basing its conclusion mainly upon findings that there were no confidential relations existing between the parties at the time of the foreclosure sale, and that Mrs. Heney was not lulled into the security that respondent's activities were being exercised entirely in her behalf and would result in the saving of the property for her at foreclosure sale; but, on the contrary, respondent made full and complete disclosure in good faith of his intention to acquire the property in his own interests in the event of a sale thereof. It follows that unless, as appellants claim, said findings are wholly contrary to the evidence, the theory of a constructive fraud is destroyed. This branch of the case therefore resolves itself into a question of whether there is substantial evidence in the record to sustain the findings mentioned, and we are convinced that there is.

The evidence bearing upon the questions of fact under consideration related to events covering a long period of time, the trial of the equitable issues having consumed several weeks, and although we shall endeavor to notice herein only the important features of respondent's evidence which in our opinion tend to support the contested findings above mentioned, the relative positions of the parties at the time of the execution of said power of attorney, their feelings toward each other, and their intentions as to the enforcement of their respective rights cannot be fairly described without referring to much of the testimony.

As to respondent's financial interest in said property, about which there is little if any dispute, the evidence shows that it arose and afterward increased in the manner following: From the beginning the operation of the vineyard for the manufacture of wine does not appear to have been a financial success, and soon after acquiring the prop-

erty Richard began to borrow money, the debts steadily increasing until ultimately the property was sold under the Wright foreclosure proceedings. As early as 1884 he borrowed money from his father, the obligations due the latter being eventually inherited by his daughters, Helena and Elizabeth, who were half-sisters to Richard and full sisters to respondent, and they continued to lend Richard money. Loans were also obtained from other individuals and certain banks. From 1894 until the end of 1913 respondent made large cash advances to Richard, guaranteed loans made to him by others, and in 1906 assumed the burden of Richard's indebtedness to Helena and Elizabeth, amounting to $18,000, thereafter paying them interest on that sum monthly. Consequently, in 1913 the total indebtedness to respondent aggregated $48,974.89, and he was given a mortgage on the real property for the principal sum of $42,-474.89 and a chattel mortgage on wine for the balance of $6,500, the mortgage on the real property being subordinate to the lien of a trust deed held by Wright securing payment of $20,000 and interest. Both liens on the real property were renewed in 1918 for increased amounts, the one to Wright for the sum of $28,000 and the one to respondent in the form of a junior deed of trust for the sum of $61,119.91, bearing simple interest at seven per cent, which did not include the sum of $6,500 covered by the chattel mortgage; and when the Wright deed of trust was foreclosed in 1922, the amount due under respondent's junior trust deed amounted to approximately $85,000, of which sum $50,000 represented the amount of cash actually advanced by respondent for the benefit of Richard and his family.

Prior to 1914 respondent's personal relations with Richard and the members of his family were most affectionate and of a fiduciary character. Besides assisting Richard frequently in a financial way, respondent acted as his confidential adviser and agent. But early in 1914 a breach occurred, caused primarily, it appears, by the constant demands Richard was making upon respondent for further financial help when the latter, on account of sickness and other adversities, was unable to respond. Thereafter respondent refused to advance more money, and they dealt with each other in a formal way, each protecting his own

interests, their business being transacted with frequent manifestations of anger and resentment. About this time, respondent had a violent quarrel with Richard's sons, Edwin and Seth, over the sale by the latter two of encumbered wine; and a few weeks later the estrangement was accentuated by the refusal of Richard to execute at respondent's request a crop mortgage, the effect of which would have been to deprive Richard of the management of the property, Richard becoming enraged at what he considered was an intrusion, and threatening the agent who presented the document for him to sign. As evidence of the strained relations then existing may be cited a letter written in February, 1914, by respondent to Richard in which he strenuously objected to further demands being made upon him for money, and complained bitterly because Richard had referred certain unsecured creditors to him for payment of their claims. In part the letter read: "It is bad enough for me to be compelled to borrow money and strain my financial credit to the breaking point to help you, without having all your unsecured creditors flock down on me. . . demanding that I should pay them. No one of them would have thought of doing such a thing if you had not told (them) to do so." He further stated that Richard's sons were able to support the family, and it was their duty to help. The letter concluded: "I cannot be worried in this way any more, and I warn you now that I shall not stand for it. You are hurting me and hurting my credit by it, and you have no moral or other right to do so."

In 1915, respondent, then living near Los Angeles, believing foreclosure proceedings imminent under the Wright trust deed on account of default in payment of interest, made arrangements with Spreckels to bid in the property for him, conditioned upon taking possession of the property after the purchase. A few months later Edwin was informed of this arrangement when he called on respondent in Los Angeles to ask respondent to meet the payment of the delinquent interest on the Wright loan, which respondent refused to do, telling Edwin, so respondent testified, that in case Spreckels did bid in the property Edwin's father and mother "would have to get off" the place; and, furthermore, that it was useless for Edwin or any other

member of the family to attempt "to get any money from him (respondent) for any purpose at any time thereafter," because he was "absolutely through doing business with them." During the years intervening between 1915 and 1921, respondent met neither Richard nor any member of his family, except Seth, whom he saw occasionally; nor did he afterward visit the vineyard, as had been his custom to do, until shortly prior to the foreclosure sale of August, 1922; and confirming his previously declared intentions, he informed Wright, in 1915 and also in 1917 in response to the latter's demand for interest money, that he did not intend to pay anything further at any time on behalf of Richard.

In 1918, the business connected with the renewal of respondent's security was conducted by respondent's agent under a letter of instruction from respondent declaring his distrust of Richard and his family, stating that they should be dealt with as strangers whom he feared might take advantage of him, and also that he "was intending to go to San Francisco to see Rudolph Spreckels to have him buy the property in" for his, respondent's, benefit. When shown this letter Richard was deeply affected, and during his last illness the year following expressed a friendly feeling toward respondent and a desire to see him, in response to which respondent sent Richard an affectionate message, but there appears to have been no reconciliation between them prior to Richard's death.

The evidence further demonstrates that following Richard's demise the strained family relations were not relaxed, but that, on the contrary, respondent evinced a stronger determination to enforce his rights under the deed of trust on account of the equitable interest held therein by his sisters. With respect thereto the proof shows that in the fall of 1920 negotiations were being carried on between Wright and Edwin to refinance the property, and respondent agreed to accept $18,000 within forty days in full settlement of his demands. In the letter extending the option, which was sent to Wright, respondent said: "If this proposition is not accepted and fully consummated within the period specified herein, I shall be forced to take steps immediately thereafter to clean the matter up, as my three sisters, who are the equitable owners of more than half the

indebtedness which is due under my aforesaid trust deed, are all too aged to earn a living for themselves, and are absolutely dependent for their support and living expenses (in large measures as to two of them, and entirely as to one of them) upon the interest which I have been paying to them regularly every month since 1904 . . ."; and as indicative of his personal feelings, respondent concluded the letter by saying that he knew Edwin had not represented the situation fairly nor had he been inclined to give him, respondent, "a square deal, notwithstanding the many and great sacrifices" he had made in the past to save the family "from bankruptcy." The option was not acted upon, however, and later in San Francisco respondent charged Edwin with conniving to defeat the entire obligation. Respondent testified that he was willing at that time to settle in full for the lesser amount of $18,000 because he had exhausted his last available assets during recent sieges of sickness, even to borrowing on his life insurance policy, and being fearful that his sisters would be left with practically nothing if anything happened to him, he concluded that if he could obtain $18,000 out of the settlement for them he would be willing to lose all that was coming to him personally.

During the latter part of the year following, 1921, owing to Wright's threats to foreclose because of default in payment of interest and Steinfeld's demand for payment of his loan, respondent held three conferences with Edwin in San Francisco to ascertain if the latter was taking any measures to raise the money to pay the debts mentioned. According to respondent's testimony he demanded at these conferences, as he had done many times before, that Edwin sell the grape crops, which were bringing big prices, and thereby pay off the loans, instead of continuing to manufacture wine as Edwin had been doing in anticipation of an early modification of existing prohibition laws, finally telling Edwin, so he claims, that unless the grapes were marketed instead of making them into wine he would proceed to sell the property under the terms of his security, adding: "You know what that means, Ed, you are going to lose the vineyard; your mother is going to lose it." Although Edwin promised at first to comply with respondent's demand, he subsequently declared his intention to manufacture wine, which he did,

thereby apparently intensifying the hostility already existing.

Coming down to the year 1922, the evidence offered on behalf of respondent was to the following effect: On April 6th respondent forwarded to the county recorder for filing a notice of his intention to foreclose, assuming that Wright had filed a similar notice, and which respondent afterward learned had been filed the preceding month. He immediately notified Edwin by letter of his action, stating that it was necessary for him to be in a position to sell at the time of the Wright sale, and inquiring as to what effort Edwin was making to raise funds to avoid a loss of the property. Edwin replied that Wright thought he would be able to take up the loan himself if given a little time, and that he would let respondent know as soon as he heard further from Wright. Subsequently, and on May 1st, at a meeting between Edwin and respondent in San Francisco, respondent learned of the nature of Wright's proposition, which he declared unsatisfactory, and he again warned Edwin, according to his testimony, that if Edwin did not succeed in paying the Wright debt and respondent was required to borrow the money to buy in the property at a foreclosure sale, he "would take possession of it as owner" and that "Edwin's folks would have to get off," stating further in this regard: "Now, Ed, keep this in mind, there is only one way for you to save the vineyard for your mother, and that is by you and Seth selling this wine in time to pay off Wright, because if I have to borrow enough money to buy this place in, I am going to buy it for myself and my sisters; and you folks will have to get off."

On June 6th, having received a letter from Steinfeld demanding immediate payment of his loan, respondent notified Edwin by mail of that fact; also that under the notice given by Wright it was legally possible for Wright to sell the vineyard on or after July 12, 1922, stating: "Under these circumstances it is necessary for us to make haste if your mother is not to lose the vineyard, and if I am not to lose all that is owing to me." In this letter suggestion was made as to the granting of the power of attorney in question, respondent saying in this regard that when in San Francisco last Spreckels informed him that if he secured a power of attorney from Mrs. Heney authorizing respond-

ent to sell the wine, he, Spreckels, believed he could dispose of the same through a friend, the wine to be sold for sacramental purposes under government permit. Respondent therefore requested that such power of attorney be given and also that a statement be furnished of the quantity and quality of the wine, respondent admonishing Edwin in the letter that immediate action was necessary if anything was "to be saved out of the wreck." In reply Edwin furnished said statement and asked that the power of attorney be forwarded to his mother for execution, which was done, respondent's₀ letter to Edwin accompanying said instrument stating in part: "I want to see the vineyard pulled out and saved, first for your mother, if that is possible, and secondly for myself for the protection of my sisters, if it is not possible to save it for your mother." Respondent further stated in said letter that there was no assurance that Spreckels could dispose of the wine, but that respondent knew he would do the best he could in that behalf. On the same day respondent wrote Spreckels to the effect that the power of attorney was forthcoming, and gave him a statement as to the grade and quantity of the wine; and on June 20, 1922, again wrote to him that the power of attorney was then in his possession, and suggesting that the 40,000 gallons of wine ought to bring enough to pay off the Wright loan. On account of sickness in respondent's family nothing further was done until July 12th, when Edwin wired to respondent in Los Angeles: "Wright to advertise Friday, can you stop him?" and respondent replied: "No, cannot stop him. I arrive in San Jose next Thursday" (the 20th). Upon respondent's arrival in San Jose he ascertained from Wright that his plan to refinance the property, so far as it affected respondent, was to have Mrs. Heney give respondent a note for $20,000, secured by a crop mortgage, in full payment of his claims. Respondent rejected the proposal, stating that he would be entitled to the crop in any event if he bought in the place at foreclosure. The day following, in San Francisco, Spreckels informed respondent of his inability to dispose of the wine, and respondent thereupon stated that inasmuch as the vineyard was about to be sold at foreclosure he wanted to borrow $40,000 with which to buy it in. Spreckels agreed to grant the loan upon the condition, required by the bank, that respondent take pos-

session of the property, which respondent agreed to do; and after signing an application for the loan a bank appraisal of the property was ordered. A few days later the bank demanded an abstract of title, which was forwarded to the bank by Edwin at respondent's request, after some difficulty in locating the same.

On the morning of July 22d respondent visited the vineyard for the first time since 1914, and meeting Edwin, told him, according to respondent's testimony, of the failure to sell the wine, of Wright's unsatisfactory proposals, and of his application for the bank loan. Respondent's testimony regarding the conversation was as follows: "I said, 'I am going to buy this property in at the sale; if the First Federal Trust Company doesn't loan me the money I am going to try and borrow it from my friends and buy it in to protect myself and your aunts.' I asked him what his reply to that was, and it was an assent. He made no objection to it, and no criticism of it. I told him that if he and Seth would sell the wine before the sale day for enough to pay Wright that I would be willing to have a first lien on the property, but that if I had to borrow any money to buy that property in, I was going to buy it in for myself, and that I would not take second place, because I had had experience enough on that with the first mortgage creeping up in amount on me, so that my security gradually got less."

The bank authorized the loan, and respondent and his wife executed the necessary documents therefor at the bank on August 4, 1922. On that same day respondent held an extended conference with Seth regarding the effect of the consummation of the loan. Although it appears that Seth had been taking an active interest in his mother's behalf, the evidence fails to show that he was authorized to represent her the same as Edwin was, and therefore the conversations held with him may be disregarded.

Respondent offered other evidence to show that following the sale he exercised acts of ownership over the property and that appellants recognized him as the owner. Immediately after the sale he notified Edwin by letter that he would assume personal control of the property, which he did by harvesting the grape crop, negotiating the sale thereof, and selling it. He also asserted title to the proceeds from the sale of the prune crop which Edwin had sold. Further-

more it was shown that Edwin dealt with respondent as owner in his effort to be retained as manager of the property and in trying to deter respondent from leasing the property to others, and also by obtaining the option to repurchase.

As opposed to the evidence contained in the foregoing narrative appellants offered much proof, but apparently no useful purpose can be accomplished by setting it forth in detail herein, because at most it does no more than raise a conflict on the vital issues under discussion. Said proof consisted largely of testimony of witnesses who gave entirely different versions as to the substance of the conversations in which respondent claims to have warned appellants of his intention to acquire the property in his own interests at the foreclosure sale. But in that state of the record the question of determining which of the two versions represented the truth was one exclusively within the province of the trial court. Appellants also point out that Edwin assisted in obtaining the loan by locating the abstract of title and forwarding it to the bank, and that on August 1st, at respondent's request, he obtained from his mother a written acknowledgment of respondent's outlawed debt, neither of which services, appellants argue, would he have likely performed if he had known of respondent's intention to acquire the property in his own interests. Moreover, attention is called to the fact that respondent never did notify Mrs. Heney personally of his intention to acquire the property to her exclusion, notwithstanding that on July 31, 1922, he met her at her home for the first time since the breach in the family relations in 1914, greeted her affectionately, and that the social intercourse was most cordial; also that on the day of the sale respondent conveyed Mrs. Heney to San Jose in his automobile for the purpose of having her acknowledge before a notary public a second document relieving his debt from the effect of the operation of the statute of limitations. Furthermore appellants draw certain inferences from portions of respondent's letters hereinabove alluded to, written during the progress of the loan and the power of attorney transactions, showing, as appellants claim, that Mrs. Heney was lulled into the security that respondent was acting in her interests and not in his own. But conceding the force of the facts and circumstances just related, and of others of like character but of

less importance which are not necessary to enumerate herein, the evident effect thereof is, as before stated, merely to produce a conflict in the evidence, and consequently, under the well-established rule, the decision of the trial court thereon must be taken as controlling.

[3] Finally, on this point it may be stated as a legal proposition that the mere execution of a power of attorney does not prohibit an agent from dealing with the subject matter of the agency, providing he shows affirmatively that he acted in good faith, fairly, and honestly, and made full disclosure of his intentions (*Hemenway* v. *Abbott*, 8 Cal. App. 450 [97 Pac. 190]; *Curry* v. *King*, 6 Cal. 568 [92 Pac. 662]); and therefore in the instant case, even assuming that the execution of the power of attorney of itself created the agency contended for by appellants, out of which a fiduciary relationship between the parties necessarily arose, respondent was not thereby precluded from acquiring the property in his own interests, having, as the trial court found and as the evidence shows, acted in good faith and fairly, after having made full and seasonable disclosure of his intentions to do so.

Regarding the contention that respondent acquired the property for a grossly inadequate price, and would be allowed also, if the judgment be affirmed, to continue in force against Mrs. Heney the obligation to pay the balance of the debt secured by his junior deed of trust, it should be observed that appellants, in making this contention, do not take into consideration the trial court's finding to the effect that ever since the foreclosure sale it "has been his (respondent's) *bona fide* intention to forgive Mary A. Heney her said indebtedness to him and to refrain from ever attempting to collect the same." The balance due on said indebtedness, after giving credit for the proceeds received from the sale of the grape crop, if added to the amount already paid at foreclosure sale, would bring the total amount of the purchase price to nearly as much as the value of the property as fixed by appellants. But assuming, as appellants contend, that the statement in the finding is not legally binding on respondent, the situation is not altered, because, in the absence of fraud, the advantages complained of were such as respondent was entitled to gain as a result of the exercise of his legal rights.

[4] Appellants further contend that irrespective of the questions arising from the execution of the power of attorney, respondent, as holder of the second lien upon the property, owed a special duty to the owner with respect to the foreclosure sale, which placed him under the obligations of a fiduciary, and that therefore, having, as junior encumbrancer, purchased at foreclosure sale under the first lien, he cannot claim absolute title as the result of the purchase, but must accord the debtor the right to redeem. (*Taylor* v. *Heggie*, 83 N. C. 244; *Pritchard* v. *Smith*, 160 N. C. 79 [75 S. E. 803].) The rule adhered to in this state is, however, that "the relation between a mortgagee and mortgagor is not fiduciary. (*DeMartin* v. *Phelan*, 115 Cal. 538 [56 Am. St. Rep. 115, 47 Pac. 356].) Neither is that between the beneficiary of a trust deed and the maker thereof. (*Copsey* v. *Sacramento Bank*, 133 Cal. 659 [85 Am. St. Rep. 238, 66 Pac. 7, 204].) " (*Lineker* v. *McColgan*, 54 Cal. App. 771 [202 Pac. 936].) To the same effect is *Ferry* v. *Fisk*, 54 Cal. App. 763 [202 Pac. 964].) Therefore the title acquired by a junior encumbrancer at foreclosure sale under the superior lien is not limited and gives no right of redemption to the debtor.

[5] The issues tendered by appellants' defenses were, in our opinion, purely equitable, and therefore appellants were not entitled as a matter of right to a trial by jury thereon. (*Fish* v. *Benson*, 71 Cal. 428 [12 Pac. 454]; *Angus* v. *Craven*, 132 Cal. 691 [64 Pac. 1091].)

For the reasons given we believe the judgment should be affirmed. It is so ordered.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 15, 1927, and a petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 14, 1927.