EDITH THOMPSON et al., Appellants, v. OMER C. THOMPSON et al., Respondents.

Gordon Gray, Walter Ames, Hewitt, Ford, Crump & Penn for Appellants.

Carl Alex. Johnson, Sloane & Sloane, and Tompkins & Clark for Respondents.

NOURSE, J.—Plaintiffs sued as legatees of specific bequests under the will of George G. MacKay, deceased, charging the defendant Thompson with fraud, deceit, and concealment through which he obtained the bulk of the MacKay estate. The cause was tried before the court sitting without a jury and resulted in findings and judgment favorable to the defendants from which the plaintiffs have appealed upon a bill of exceptions.

MacKay died testate on the eighteenth day of October, 1921, and by the terms of his will, executed May 20, 1921, he made specific bequests aggregating $150,000 to the plaintiffs herein—two sisters, a brother, and two nieces, all of whom resided in Canada at all stages of this proceeding. In due course of administration of the estate a final decree of distribution was entered February 14, 1923, reciting that all the money on hand for the payment of such bequests was the sum of $20,808.81 and awarding to each of said legatees a proportionate amount of the sum named in the will, leaving an unpaid balance to plaintiff Edith Thompson of over $43,000 and an unpaid balance to each of the four other legatees of over $21,000. Charging that the de-

fendant Thompson immediately upon the death of the deceased entered into a scheme to defraud the estate of valuable assets, and that, as a part of such conspiracy, he deceived the executor and his attorney by misrepresenting to them material facts and by withholding and concealing valuable information from them, the plaintiffs by this action seek to have certain deeds and transfers annulled and set aside, certain court proceedings declared void, and asked that the shares of stock of the two corporations organized by the deceased and defendant Thompson be declared property of the MacKay estate or that in lieu thereof the defendants be adjudged to hold the properties of said corporations in trust for the plaintiffs or be required to pay from the proceeds thereof the unpaid balance which plaintiffs claim to be due under the terms of the will.

The business association of MacKay and Thompson began some time in 1905 for the purpose of acquiring real property in the city of San Diego. MacKay was a resident of the city of Los Angeles, where he was employed as a silk buyer and was reputed to be a man of means, and Thompson was an employee in the shoe department of a dry-goods concern located in the city of San Diego. The two were warm friends who trusted each other implicitly and entered into their real estate venture without any formal articles of partnership. In this manner they acquired a number of properties in that city, title always being taken in the name of Thompson, but in February, 1910, they executed a partnership agreement reciting the fact that they had acquired the properties in the manner stated and that the purpose of the agreement was to declare that each owned an undivided one-half interest in all the properties acquired, that is to say, the properties which they at the time held and which were expressly described in the partnership agreement. Thereafter and on September 21, 1910, MacKay signed a grant deed conveying to Thompson an undivided one-half interest in all the real property described in this partnership agreement and handed the deed to a notary public, who took the acknowledgment, with instructions to deliver it to Thompson on the death of the grantor. The parties continued under their partnership arrangement to buy and sell other properties in the city and some time in the year 1913 they erected the Knickerbocker Hotel on lots A and B

of block 63, lot A being one of the lots which was included in the partnership agreement as well as in the MacKay deed of 1910 and lot B having been acquired by the parties at a time subsequent thereto, which is not disclosed by the evidence. In 1915 defendant Thompson left the shoe department and became the manager of the Knickerbocker Hotel, which position he occupied at the time of the death of MacKay. In the latter part of this year and in January, 1916, Thompson was sued by a creditor named Daugherty and actions were threatened by other creditors. To avoid these creditors Thompson organized two corporations, one the Thompson MacKay Company, incorporated for 1,000 shares, and the other the Omer C. Thompson Company, incorporated for 150 shares. One share of stock of each of these corporations was issued to Thompson and two dummies who were named as incorporators and who became, with Thompson, the directors of each corporation. Thompson was elected president, treasurer and general manager and in fact became the sole directing head of both corporations. At the time of incorporation Thompson procured the passage of a resolution by the board of directors of the Thompson-MacKay Company reciting that an offer had been received from MacKay to sell to the company all the real properties described in the partnership agreement (except two lots which are not involved here) and also lot B of block 63, one of the lots upon which the Knickerbocker Hotel had been built. This offer was formally accepted by the directors and in consideration of this transfer 997 shares of its stock were issued to MacKay. At the time of this resolution and for the purpose of carrying it into effect the defendant Thompson filed a sworn statement with the commissioner of corporations seeking permission to issue 997 shares of the stock of this corporation to MacKay for the purpose of enabling the corporation to take over and operate "real estate holdings of George G. MacKay, now under record ownership of Omer C. Thompson, holding such as trustee for said George G. MacKay." On the same day defendant Thompson and his two associate directors of the Omer C. Thompson Company passed a resolution reciting an offer by Thompson to sell and convey to the company other real estate located in San Diego and for the purpose of carrying out this transaction defendant filed another sworn

application with the commissioner of corporations to take over and operate real estate holdings of the said defendant. In support of these applications the defendant Thompson filed with the commissioner of corporations appraisals, sworn to by Nat R. Titus and one other, reciting that the properties conveyed to the Thompson-MacKay Company were of the value of $315,000, and that the properties conveyed to the other corporation were of the value of $55,000, and the defendant Thompson filed with the commissioner a sworn statement to the effect that mortgages outstanding against the former company amounted to $199,500 and that mortgages against the property conveyed to the latter company amounted to $33,500. Upon these representations the commissioner of corporations authorized the issue of the stock as requested and certificates were accordingly drawn and delivered to MacKay covering 997 shares of the Thompson-MacKay Company and 147 shares of the Omer C. Thompson Company. McKay took complete possession and control of these certificates of stock, continued to vote the shares, either in person or by proxy, and pledged them to one S. M. Wilson for a personal loan of $50,000. From the date of issue of these certificates—March 27, 1916—until March 28, 1922, some five months after the death of MacKay, all this stock stood of record in his name upon the books of both corporations. During the year 1916 Thompson testified in supplemental proceedings in a suit brought by one of his creditors against him that MacKay was the absolute and full owner of the stock of both companies and that he, Thompson, had no interest of any nature in any of this stock. On numerous occasions prior to the death of MacKay, Thompson asserted that the ownership of the entire stock was in MacKay and as president of both corporations he participated in meetings and signed minutes reciting the fact of this ownership.

On the day following the death of MacKay, Thompson and his agent, Nat R. Titus, moved quickly to perfect their plan to acquire possession of all the property and interest which MacKay had in these corporations. First Titus went to the executor named in MacKay's will and advised him that the hotel property in San Diego was mortgaged for all it was worth. A few days later he produced the deed executed by MacKay in 1910 and had it recorded, and, at

about the same time, recorded the partnership agreement executed in the same year. He was then elected director and vice-president of the Thompson-MacKay Company and participated in a resolution of the board of directors of that company voting to Thompson back salary at the rate of $500 per month from March 1, 1916, to November 1, 1921, totaling the sum of $34,000. At the same time the directors of this corporation, without any pretense of consideration, authorized a conveyance of all its properties to the defendants Thompson and Titus, and Steinmetz, the other of the three directors, who was also an agent of Thompson, joined in the execution of such a deed. In order to effect this transfer Thompson signed what he termed a ''consent to sale'' in which he recited that he was the owner of 998 shares of the stock of the corporation. Similar proceedings were had by the same directors in the Omer C. Thompson Company and there Thompson signed a consent to sale reciting that he was the owner of 148 shares of the stock of that company, whereas the owner of record of this stock in both corporations was George MacKay. Both deeds of conveyance were executed by Titus and Thompson's agent and were recorded with Thompson's ''consent to sale'' attached to them.

Thereafter and on November 16, 1921, less than 30 days from the death of the decedent, Thompson served upon the executor written notice that he owned all the stock in both companies. On the same day Thompson, Nat R. Titus and Thompson's attorney Johnson went to Los Angeles and conferred with the executor and his attorney, one W. W. Butler. The testimony of no one of the five parties present at this conference agrees as to what occurred. But it stands out unmistakably from the record that Thompson, his agent and his attorney did everything possible to deceive the executor and his attorney as to the facts relating to the ownership of the properties in San Diego and that they concealed from them practically all the facts and circumstances relating to the various transfers and other transactions which we have heretofore recited. The executor who had been a warm friend of the deceased and who now became a partisan of the defendant Thompson was apparently satisfied by what occurred at this conference to sit idly by and let Thompson have his own way as to the disposition of the

properties which might otherwise have been claimed by him on behalf of the heirs of the estate. He immediately petitioned the probate court for a reduction of his bond as executor from $100,000 to $25,000 and this was granted upon his representation that he had discovered within this short period of time that the estate did not own the properties in San Diego claimed by the decedent. No investigation was made by the executor or his attorney as to the merits of the claims presented by the defendant Thompson and his agent, but, acting upon these representations alone, the executor permitted this defendant and his attorney to conduct a sale of all the stock which had been issued to the decedent to satisfy the claim of Wilson, who held the stock as pledgee to a purported loan to the decedent, which loan was not evidenced by any writing other than a canceled check. It is claimed by the plaintiffs that this sale was all a part of a scheme planned by this defendant and his attorney to lead the executor to believe that the estate had no claim which it could assert against the defendant Thompson; that as a part of this scheme these parties, well knowing that the value of this stock was approximately $105,000, arranged to have a dummy bid it in at the sale for the sum of $5,000, which sum was supplied by Thompson; and that for the purpose of preventing others from bidding at the sale they represented that the entire physical properties of the corporations were mortgaged for all they were worth and for the same purpose they instituted suit in the superior court of San Diego County against the MacKay estate and Wilson to quiet title to the pledged stock, claiming Thompson to be the owner. Concealment on the part of this defendant is charged in his failure to disclose at this time that the corporations had on deposit in the name of the Knickerbocker Hotel $8,369 in cash. In any event, the plans of this defendant were successful because neither the executor nor his attorney attended the sale and no bid was offered excepting one in the name of the defendant A. B. Titus in the sum of $5,000 and the stock was accordingly sold to him for that amount. Immediately thereafter the action to quiet title to the stock commenced in San Diego County on February 21st was dismissed, and on March 1, 1922, Thompson filed suit to quiet title against the executor and A. B. Titus, the purchaser at the pledgee sale. Process was served

upon both defendants, but the executor failed to appear and his default was accordingly entered. The defendant Titus, however, did appear by one of Thompson's attorneys and these parties entered into a stipulation which gave to Thompson all that he could possibly have asked for and upon which a decree was entered quieting title in Thompson of all the stock of these corporations. Soon thereafter Thompson procured an order of court dissolving both corporations.

As pointed out by the trial court in summing up the evidence at the close of the trial, there was so much false testimony and concealment on the part of Thompson that it is difficult to analyze the evidence as to what has been proved and what has been left to conjecture. The facts which we have heretofore stated, independent of the contentions of the respective parties, were all found to be true by the trial court, but upon these facts the trial court drew the conclusion that the plaintiffs had failed to prove a case of fraud which would justify the court in setting aside the pledgee's sale of the stock, decree quieting title thereto or the final settlement and decree of distribution in the probate proceedings. On this appeal it is the theory of the appellants that the pledgee's sale was so tainted with fraud that the court should have no hesitation in declaring it void and of no effect; that the decree quieting title to the stock, which was based upon this sale and the collusion of the parties to that suit, was procured wholly through extrinsic fraud on the part of the respondents and that equity should declare that decree void and of no effect; that the final settlement and decree of distribution in the probate proceedings are not necessarily attacked in this action, but that the court could, if it supported appellants' charge of fraud, declare what portion of the property involved rightly belonged to the MacKay estate and that that property could then be administered on in the probate proceedings as property discovered after the final decree of distribution. The trial court in ruling upon appellants' contentions took the position that though the facts proved unquestionably showed unfair and reprehensible conduct on the part of Thompson and inexcusable stupidity and incompetence on the part of the executor and his attorney in their failure to protect the interest of the heirs in probate proceedings, there was no duty upon Thompson or his agent to play fairly with the executor or

his attorney and hence his conduct was not actionable. It is the theory of the appellants that a partnership relation existed between Thompson and MacKay from 1910 to October, 1921, the date of MacKay's death, or that if this partnership was dissolved by the formation of the corporations in 1916, nevertheless the evidence amply supported the trial court's finding that ''at the time of MacKay's death there existed between said Omer C. Thompson and George Grant MacKay the most friendly and confidential relationship.'' Upon these premises the appellants argue that when the respondent Thompson, immediately after the death of MacKay, approached the executor and his attorney he at least gave the latter the impression that Thompson and MacKay were in partnership at the time of the latter's death and that whatever information Thompson gave could be treated as coming from a partner and a confidential friend of the deceased. From this it is argued that because of the confidence which this respondent invited from the executor and his attorney these representatives of the heirs of the estate were led to rely upon the representations of this respondent to the injury of the heirs. It is then argued that because Thompson and MacKay were partners at the time the corporations were formed and because these corporations were formed solely for the purpose of helping Thompson defraud his creditors, the business being conducted in practically the same way as during the partnership, the confidential relation which existed between the two as partners continued down to the death of MacKay and made Thompson an involuntary trustee of the partnership property for the benefit of MacKay's heirs; and that because of this fiduciary relation between Thompson and the heirs Thompson was required to use the utmost candor and strictness of accountability in his dealing with the executor while the latter acted in the capacity of an agent or representative of the heirs.

In defending the judgment respondents emphasize three defenses which they insist are conclusive against any cause of action urged by the appellant. These are, first, the transfer by the decedent, in his lifetime, to Thompson of all his interest in the physical properties of the partnership; second, the subsequent purchase at the pledgee's sale by Thompson of all the stock in the two corporations, and, third, the decree of the superior court quieting title in Thompson to

this stock and to the physical properties held by the corporations.

As to the deed executed by the decedent in 1910 conveying to Thompson an undivided one-half interest in the real property owned by the partnership, the trial court found that it was delivered to Nat R. Titus by the decedent with instructions to hold the same until the death of decedent and thereupon to deliver the same to Thompson. From these facts the trial court concluded that the decedent thereupon surrendered the possession and control over the deed to Titus and reserved no right to recall it or to change its provisions. This finding is attacked by the appellants· upon the ground that it is not supported by the evidence. The evidence of the actual transmission of the deed is found in the testimony of Nat R. Titus alone. When asked to state the circumstances of the execution and delivery to him he answered, "Well, I told you I didn't remember so much about the execution of it, but I remember his giving it to me and telling me to hold it, *and if he died before Thompson*, to give it to Thompson." On further examination of this witness by respondents' counsel he repeated that nothing had been said to him by the decedent excepting what has just been quoted. But later in his examination, in answer to the question, "Precisely just what were his instructions to you?" the reply was, "To give it to Thompson when he died." As bearing upon the intention of the grantor in making and delivering this deed we find the testimony of respondent Thompson that "MacKay and I had this understanding: When he died his property —all his property should come to me; and I had this understanding with MacKay: When I died all my property should go to MacKay." There is also the testimony of the witness Campbell, executor of the MacKay estate, to the effect that MacKay said there was such an understanding between himself and Thompson, and the testimony of the same witness that MacKay informed him "That several years ago a deed had been prepared and executed and placed in trust of all the property in San Diego, and was to be delivered upon—to Mr. Thompson, upon his death, whenever it might be." Then there is the testimony of Dr. Cook, an intimate friend of the two partners, that the decedent said to him, "I have deeded the San Diego property to Thompson

in case of my death." And the testimony of the witness Campbell that the decedent informed him that he and Thompson had so arranged their affairs that in the event of his death everything went to Thompson, and in the event of Thompson's death everything went to him, an arrangement which was conceded by Thompson but which apparently was not carried out on his part. This is all the testimony bearing upon the matter of the execution and delivery of the deed upon which the trial court was required to find whether the grantor intended to pass a present title, except the undisputed evidence that from the time of the execution and delivery of the deed down to the death of the decedent the grantor continued to claim and assert title in himself, and the grantee, fully aware of all the circumstances, continued to recognize the grantor as the equitable owner of all the interest purported to have been conveyed by the grantor, and except, also, the inferences to be drawn from the conveyance to the corporation and the general conduct of the parties.

The vital question to be determined in a case of this kind is whether the grantor intended to vest a present title in the grantee upon delivery to the holder of the deed or whether delivery by the holder to the grantee was conditional upon the prior death of the grantor. If the latter, the purpose of the grant is deemed to be testamentary and subject to all the rules required by the law of wills, and if these rules have not been complied with the deed cannot be given effect as vesting any title in the grantee. (*Williams* v. *Kidd*, 170 Cal. 631, 637 [Ann. Cas. 1916E, 703, 151 Pac. 1].) The best evidence of the intention of the grantor is the evidence of the instructions given by him to Titus at the time of the delivery of the deed. This evidence is that the grantor told Titus to hold the deed and deliver it to Thompson if he, the grantor, died before Thompson. This clearly implies that the delivery of the deed was conditional upon the prior death of the grantor and demands a holding that it was ineffectual for the purpose of vesting a present title in Thompson. (*Stone* v. *Daily,* 181 Cal. 571, 575 [185 Pac. 665].) These facts, taken with the undisputed evidence of the conduct of the parties with full knowledge of the transaction, would require a finding that

the deed was testamentary in character and was not intended to vest a present title in the grantee.

But aside from this the trial court found upon undisputed evidence that for a period of six years after the execution of this deed the parties continued to deal in the properties covered by the deed as partners or joint owners, each owning an undivided one-half thereof. During all this time the record title of all the properties involved stood in the name of Thompson and the interest of MacKay therein was fixed so far as any writing is concerned by the articles of copartnership wherein the interests of the two parties were declared to be an undivided one-half of the whole. This condition continued until the formation of the two corporations in 1916 when Thompson, holding the record title of all the property, and with full knowledge of the MacKay deed, voluntarily conveyed all to the Thompson-MacKay Company and added to the deed a lot which was not included in the MacKay deed. At this time Thompson took oath that all the property belonged to Mac-Kay and thus denied any claim which could have been made at that time that the MacKay deed vested complete title in him. This arrangement, it is true, was made by Thompson for the purpose of defrauding his own creditors, but it nevertheless served the purpose of transferring to the corporation all the title which Thompson had or might. claim either legal or equitable in all the properties mentioned in the MacKay deed. Thus if the MacKay deed had transferred to Thompson the equitable title to one-half of the property, the deed of Thompson to the corporation made six years thereafter transferred to the corporation all the title which Thompson then had both legal and equitable, and the subsequent testimony of Thompson given to the commissioner of corporations and in the superior court on supplementary proceedings to the effect that MacKay was the sole owner of the stock of the corporation to which this property had been transferred and that he, Thompson, had no interest or claim to any portion of the stock or assets of the corporation, disposes of any claim which he may make at this time that he was in fact an equitable owner of a one-half interest in the physical property of the corporation by reason of the MacKay deed.

The second and third defenses urged by the respondents are sufficient only in the event that it should be held that the conceded transactions of the respondent Thompson immediately following the death of MacKay consisting of misrepresentation, concealment, and deceit, all intended to mislead the executor and to prevent him from taking any steps to protect the interest of the heirs of the estate, do not constitute actionable fraud. In determining this question it is necessary to first look to the relationship existing between Thompson and MacKay and between Thompson and the executor of the MacKay estate.

■  We are satisfied from our review of the undisputed evidence that the court erred in concluding from the evidence and its findings that the deceit and misrepresentations of Thompson were made between parties acting at arm's length and did not constitute actionable fraud. The evidence and the findings show that Thompson upon more than one theory was bound to act toward the executor and the legatees, whom the latter represented, with the honesty and fidelity exacted by law of a trustee. This is the pivotal point in the case for, once granting that Thompson could not deal with the executor as one at arm's length it then follows: *First*, that his misrepresentation to the executor of facts concerning the property of the estate was actionable fraud; *second*, his misrepresentation forestalling a defense to the action quieting title to the stock was extrinsic fraud preventing the appellants herein from having their day in court; *third*, his misrepresentation forestalling the executor from reclaiming the pledged stock to the estate was also actionable fraud which entitled those who were defrauded thereby either to sue in damages for the deceit or to follow in equity the said stock so fraudulently obtained by Thompson and to claim the property into which the said stock was transmuted by Thompson's subsequent machinations.

Thompson was bound to this degree of fidelity to the representative of the deceased because: (1) He was the surviving partner of a partnership which owned the property which stood in the name of the corporation(s), equity looking through the form of the corporation and seeing the real partnership thinly disguised behind the corporate dress; (2) or because he was a surviving partner of a partnership which may have been temporarily dissolved at the time

of the formation of the corporation(s) but which sprung into existence again immediately thereafter and then owning as its partnership property not the property which had been conveyed to the corporation entity but the stock in that corporation; (3) because, even if the partnership was so ragged that it could not be said in law to be a real partnership, nevertheless the relation between Thompson and the deceased at the latter's death was one of trust and confidence in fact. Fiduciary relations are not found solely in those legal relationships, such as guardian and ward, husband and wife, trustee and beneficiary, but are also found where in fact the relation of trust and confidence exists between trusting friends. (*Palladine* v. *Imperial Valley F. L. Co.*, 65 Cal. App. 727, 745 [225 Pac. 291].)

Whether Thompson comes within one or the other of the three categories just enumerated is immaterial in this case. His duty was the same in each. There might have been some difference as to the form of accounting and remedy available to appellants if the partnership owned stock in a corporation and not the very property of the corporation, but that difference can now no longer exist because Thompson has again transmuted the corporate stock back into tangible property.

The trial court found that at the time of MacKay's death "there existed between said Omer C. Thompson and George Grant MacKay *the most friendly and confidential relationship.*" And in an opinion filed by the trial judge immediately following the submission of the case his views upon this issue were expressed as follows: "It is my opinion that from the date of the written partnership or property agreement, in February, 1910, down to the death of Mr. MacKay, in October, 1921, the Thompson and MacKay San Diego property, including the stock of Thompson-MacKay Company (after its incorporation), was owned jointly by Thompson and MacKay, an undivided one-half interest in each, and that both Thompson and MacKay so understood it, regardless of what either of them said about the ownership of the property for the purpose of evading or defrauding creditors, or for any other purpose, and regardless of who had possession of the stock or other property or in whose name it appeared on the records." These views of the trial judge are fully supported in the evidence and this

evidence supports the finding of fact just referred to. ▉ But we are convinced from our examination of the record that the conduct of the parties throughout this entire period showed unmistakably that they intended that the partnership arrangement should still continue irrespective of who held the legal title to the real property or as to who appeared as the record holder of the certificates of stock of the corporation, there being no evidence of any character showing an intention to dissolve the partnership. The presumption that a thing once proved to exist continues as long as is usual with things of that nature (sec. 1963, Code Civ. Proc.), would have supported a finding that the partnership relation between these parties continued to exist down to the death of MacKay.

But the question of the existence of the partnership at the time of MacKay's death is important only in so far as it goes to the matter of the degree of good faith required on Thompson's part. The theory upon which the appellants proceeded is that Thompson occupied a position of trust and confidence with MacKay and that he dealt with the executor of the estate on the basis of this fiduciary relation; that, immediately upon the death of MacKay, Thompson and his agent Titus made every effort to gain the confidence and trust of the executor and his attorney and that they trusted these parties implicitly and dealt with Thompson as the confidential representative of the deceased. In *Hemenway* v. *Abbott*, 8 Cal. App. 450, 463 [97 Pac. 190, 195], it is said that this fiduciary relation "exists and relief is granted in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies on another." The facts here are similar to those in *Morgan* v. *Asher*, 49 Cal. App. 172 [193 Pac. 288], where the court required of an executrix a greater degree of good faith because of her confidential relation with the decedent who was her husband. Here Thompson was the trusted agent and business associate of the decedent for a period of eleven years or more, during a portion of which time he acquired real property, had taken the legal title in his own name, and managed all the

business affairs of the two after the corporations were formed as well as before. In the Morgan case the court said: "She is averred to have occupied toward her said husband during the latter days of his lifetime and up to the date of his death the position of his agent, intrusted by him with the exclusive custody and control of the whole of his real and personal property, and particularly of that most important portion thereof which consisted of bonds and other securities of the value of at least one hundred thousand dollars. As to these latter properties she was his trustee, as such agent, at the time of his death, and immediately upon his death she became the trustee of all those persons who, either as heirs or legatees, were entitled to share in his said estate by virtue of this relationship or under the provisions of his will."

It cannot be disputed that Thompson not only failed to state truly what he told the executor but that he also suppressed and concealed material facts in his plan to acquire the property of the estate. On the day following MacKay's death his associate Nat R. Titus informed the executor that the San Diego properties were mortgaged for all they were worth, Titus and Thompson then arranged for the recording of the articles of copartnership and the MacKay deed both executed in 1910; they arranged for a meeting of the directors of the corporation controlled entirely by them and fraudulently voted to pay Thompson back salary in the sum of $34,000; they fraudulently authorized the corporations to convey all their physical properties to Thompson and deeds of conveyance were executed by Thompson's agents for this purpose. Within 30 days after the death of MacKay they called upon the executor in company with Thompson's attorney Johnson and informed the executor that Thompson owned all the stock and all the physical properties of the corporation; that neither the stock nor the properties were of any value over the indebtedness; *but failed to inform* him or his attorney of the circumstances under which the deed of 1910 was executed and delivered; or that subsequent to the execution and delivery of that deed Thompson voluntarily deeded all interest in the properties to one of the corporations. By these acts of misrepresentation and concealment and by the institution of an action to quiet title on behalf of Thompson to all the stock

immediately preceding the pledgee's sale, and by the failure to disclose to the executor that the corporations had money in bank under the name of the Knickerbocker Hotel amounting to over $8,000, Thompson prevailed upon the executor to absent himself from the pledgee's sale and to allow Thompson's dummy to purchase all the stock upon the single bid of $5,000. The trial court did not find as to the source of the funds used by Thompson for this purpose, but the inference may be fairly drawn that he used these corporate funds directly for the stock purchase or reimbursed himself from this deposit. In any event he obtained possession of the entire deposit, in addition to the stock of an estimated value of over $100,000, without a fair disclosure. The estate was injured to the extent of being compelled to pay $20,000, the balance of the pledge, whereas, if the executor had been the successful bidder at the sale, the amount paid would have lessened the liability of the estate to the pledgee. It cannot be disputed that if the estate had purchased the stock Thompson could not have successfully asserted any claim to it because of his fraud in permitting MacKay to become apparent owner. Thus, as the purchaser at this sale would have become the valid owner of the stock, notwithstanding the false claims of ownership of the physical properties of the corporations, he would have had clear title to the money on deposit. All this Thompson obtained by his influence upon the executor, thus making him an involuntary trustee for the heirs under section 2224 of the Civil Code.

While holding this stock as a trustee for the heirs, Thompson commenced an action against the estate and A. B. Titus, purchaser, to quiet title. Relying upon the representations theretofore made to him by Thompson, the executor permitted his default to be entered and made no appearance at any stage of the proceedings. The dummy who had been procured by Thompson to purchase the stock at the pledgee's sale was represented in court by counsel employed by this respondent. The two respondents herein, then having control of both sides of the litigation, stipulated to everything which Thompson desired in order to procure a judgment quieting title to all the stock in him. This entire transaction was a fraud upon the court and a fraud upon the executor and upon the MacKay heirs. The case comes

squarely within the rule of *Newport* v. *Hatton*, 195 Cal. 132, 143 [231 Pac. 987], and cases cited. This decree was therefore fraudulent and of no binding effect upon the MacKay heirs.

Having obtained possession of all the stock of the corporation belonging to the MacKay estate through fraud and breach of his fiduciary relation Thompson went through the form of conveying all the physical properties of the corporation to himself by representing himself to be the legal owner of the stock, but as trustee for the heirs in the stock he also became trustee of the physical properties of the corporation, because, not being the legal or equitable owner of the stock, he was not able to convey to himself a good title to the corporate properties. This follows because of section 2243 of the Civil Code, which provides: ''Everyone to whom property is transferred in violation of a trust, holds the same as an involuntary trustee under such trust, unless he purchased it in good faith, and for a valuable consideration.''

Upon the undisputed facts in the record the appellants were entitled to a decree canceling the deed from MacKay to Thompson made in 1910; adjudging and declaring void as to them the decree quieting title to the corporate stock entered on March 24, 1922; and adjudging and decreeing that the respondents hold as trustees for the appellant an undivided one-half interest in all the properties and assets owned by the Thompson-MacKay Company at the time of MacKay's death and the rents, issues and profits accruing thereafter, to the extent that such portion of the properties, rents, issues, and profits of this corporation come within the unpaid balance of the individual legacies to each of the appellants, and that if said legacies cannot be paid in full then each of the appellants is entitled to judgment proportionate to the amount of the unpaid balance of each.

In explanation of the foregoing it should be said that the appellants have throughout this litigation insisted that because all the stock of both corporations was issued and held by MacKay as a part of the scheme to defraud Thompson's creditors Thompson is thereby estopped and foreclosed from making any claim to any of the stock of either corporation upon the well-settled rule found in *Moore* v. *Schneider*, 196 Cal. 380, 385 [238 Pac. 81]. The respond-

ents concede the rule but insist that it is not applicable here because they were not the moving parties in this litigation and because MacKay having knowledge of the fraudulent purpose of the transfer is also estopped through his heirs from claiming any benefits out of Thompson's fraud. No authority has been cited holding that a party who has thus been estopped from becoming an actor in a court of equity because of his own fraud may obtain all that he could seek in a court of equity by committing another fraud which puts his adversary on the offensive. We are not disposed to examine the point further because we are convinced that the evidence fully supports the conclusion of the trial court that from the time of the organization of the corporations down to the death of MacKay the latter held all the stock of the Omer C. Thompson Company in trust for Thompson and that he held all the stock of the Thompson-MacKay Company in trust for Thompson and himself according to their proportionate share. We are also convinced that the undisputed evidence compels a finding that the interest of Thompson and MacKay in the stock of the Thompson-MacKay Company was an undivided one-half interest in each. It will, however, be necessary to take further evidence to determine the values of these properties and assets and to take an accounting as prayed for in the complaint. The judgment is therefore reversed with instructions to the trial court to take evidence upon these issues alone and to enter judgment in accordance with the views expressed herein, awarding to each appellant his proportionate share, and to grant to the appellants such further relief as may be necessary to finally dispose of the controversy.

Koford, P. J., and Sturtevant, J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 2, 1928.

All the Justices present concurred.