[Civ. No. 4359. Second Appellate District, Division One.—October 2, 1924.]

ZEPHIR F. COLLETTE, Plaintiff and Appellant, v. HYACINTHE SARRASIN, Respondent; JOHN M. BOWEN, as Administrator, etc., Intervener and Appellant.

[1] DEEDS — CONVEYANCE BY MORTGAGOR TO MORTGAGEE — CONSTRUCTION—EQUITY.—In order to give validity to a deed made by a mortgagor to his mortgagee, it must be shown that the conduct of the mortgagee was in all things fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears and poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him; and where confidential relations exist, the scrutiny is severer than in cases of a different character.

[2] ID.—ABSOLUTE CONVEYANCE—EVIDENCE—FINDINGS.—In this action, instituted after the death of the grantor, to have a grant deed executed by said grantor to his uncle (to whom the grantor was indebted for a large sum of money) declared to be a mortgage, the evidence as to the relationship of the parties, as to the fact that the property in question had been the subject of a prior gift from defendant to the grantor, and as to the remarks of the grantor, at or about the time of executing the deed in question, not only to defendant and to the attorney employed to prepare the deed, but also to a third person, as to the reason for making the deed, justified the trial court in concluding that the deed was not given as security but was intended as a conveyance of all his interest in the real property; in fact, the evidence showed that the prime purpose of the grantor in the execution of the deed was to make an absolute gift of the property to defendant in grateful remembrance and acknowledgment of a lifetime of care and kindness bestowed upon him (the grantor) by his uncle, the defendant.

[3] ID.—OWNERSHIP OF PROPERTY—RIGHT TO MAKE GIFT.—The property, subject to the mortgage in favor of defendant, having belonged to defendant's nephew, and the latter having been of lawful age and of sound and disposing mind, he had the legal right to make any disposition of the property as might appear to him to be proper; and in this action, there was no evidence that any im-

1. Parol evidence that written instrument which on its face imports a complete transfer of a legal or equitable estate or interest in property was intended as a mortgage, note, **L. R. A.** 1916B, 18. See, also, 19 **R. C. L.** 261; 17 **Cal. Jur.** 776–796.

proper or undue influence was exerted over him by defendant or by anyone else to induce him to execute the grant deed in favor of defendant, and there appeared no legal reason that would justify a court in decreeing that the deed was anything else than what it purports to be—an absolute conveyance of the real property described therein.

[4] ID. — RESTRICTED CROSS-EXAMINATION — IMMATERIAL ISSUES — ABSENCE OF PREJUDICE.—On appeal from a judgment in such action, the trial court will not be held to have committed reversible error in sustaining objections to three questions propounded to respondent on cross-examination, and which had to do mainly with prior statements which respondent had made, either in his deposition or at the prior trial of the action, where the questions did not involve any material issues in the case, and no showing is made that appellants were prejudiced by the ruling complained of, and it does appear that substantially the same questions were asked in different form and answered by the witness.

(1) 27 Cyc., p. 1374.    (2) 27 Cyc., p. 1024.    (3) 27 Cyc., pp. 1024, 1374.    (4) 4 C. J., pp. 968, 969, sec. 2951.

APPEAL from a judgment of the Superior Court of Los Angeles County. Russ Avery, Judge. Affirmed.

The facts are stated in the opinion of the court.

Oscar Lawler and Lawler & Degnan for Plaintiff and Appellant.

A. I. McCormick for Intervener and Appellant.

Emmet H. Wilson, G. C. DeGarmo and J. Wiseman Mac-Donald for Respondent.

CURTIS, J.—Zephir F. Collette, the father and only heir of Clifford R. Collette, deceased, instituted this action for the purpose of having a grant deed, executed by Clifford R. Collette during his lifetime to the defendant Hyacinthe Sarrasin, declared to be a mortgage. Upon a trial of the action judgment was rendered in favor of plaintiff, but upon appeal the supreme court reversed the judgment because of the error of the trial court in excluding certain testimony. (*Collette* v. *Sarrasin,* 184 Cal. 283 [193 Pac. 571].) Thereafter but prior to the second trial, which resulted in the

judgment from which the present appeal was taken, John M. Bowen, as administrator of the estate of the said Clifford R. Collette, deceased, filed a complaint in intervention, in which he joins with the plaintiff in asking that the deed in question be declared a mortgage. The case was tried by a jury to which special interrogatories were submitted. These interrogatories covered the principal issues presented by the pleadings. The jury found in favor of defendant upon all matters submitted to them. The court in its findings of fact adopted, in the main, the verdict of the jury and rendered judgment in favor of the defendant. The plaintiff and intervener appealed.

Clifford R. Collette lived with his father in the state of Wisconsin until he was nine years of age, when he was taken by the respondent and his wife into their own family. His mother had died some years before and in the meantime his father had married a second time and had three children by his second marriage. The respondent and his wife, Alphonsine Sarrasin, lived in Los Angeles, California. Mrs. Sarrasin was the sister of Clifford's mother and was, therefore, Clifford's aunt. In 1893 they visited the Collettes in the state of Wisconsin. It was on the occasion of this visit that the Sarrasins took Clifford into their family, and shortly thereafter returned with him to their home in Los Angeles County, California. Thereafter, with very slight exceptions, Clifford made his home with the Sarrasins until his death. The Sarrasins had no children of their own and after taking Clifford into their home he was treated as their own child. The entire expense of his care, maintenance and education was borne by his uncle and aunt, the Sarrasins. His father, during this time, contributed nothing toward his support, and never even remembered him at Christmas-time or on his birthdays. He never wrote to Clifford. In turn, Clifford never wrote to his father, and his aunt, Mrs. Sarrasin, was not able to persuade him to do so. On October 8, 1907, the respondent purchased the property involved in this litigation, paying therefor the sum of $5,000, and caused the title thereto to be taken in the names of respondent and Clifford as tenants in common, thereby making Clifford a gift of an undivided one-half thereof. The land, when purchased by respondent, was unimproved. Im-

mediately thereafter, and at an expense of at least $2,200,
respondent built upon the premises a dwelling, barn and
other outhouses. He planted the land to orange trees at a
cost of over $1,500. He also purchased farming imple-
ments, horses and wagons to be used on the property. On
April 28, 1910, he conveyed to Clifford the remaining undi-
vided one-half of the property, together with thirteen shares
of the capital stock of the Rivera Fruit Exchange, also the
farming implements, horses and wagons. At this time Clif-
ford executed to respondent his promissory note for $5,000
and secured the same by a mortgage upon the real property.
Thereafter the orange grove, for it had now become such,
was cared for by Clifford, but by means of funds advanced
to him by respondent, so that at the date of the deed from
Clifford to respondent, being the deed which it is sought to
have declared a mortgage, Clifford owed the respondent, in
addition to the promissory note of $5,000 secured by mort-
gage, the sum of $4,000. This latter indebtedness was repre-
sented by unsecured notes of Clifford. Clifford never had
the best of health. As a child he was sickly, and as he grew
to manhood his ill health continued. He was afflicted, at
least in the latter years of his life, with tuberculosis. He
went to Palm Springs for his health in the first part of the
year 1916, and on March 2d of the same year he went to
the sanitarium at Sierra Madre, where he died two weeks
later. His aunt, Mrs. Sarrasin, had died in January of the
same year. On the day he went to the sanatarium he exe-
cuted the deed in question to his uncle, the respondent herein.
The evidence shows that on the day he made the deed he
stated to the respondent, ''Uncle, you are the only man that
ever done anything for me and I am going to the sanitarium,
and I don't know as I will ever come back. The ranch has
depreciated in value, and I don't know that you will ever
get your money back, but that is all I can do. I will deed
the property back to you.'' A short time prior thereto he
had stated to an old friend, Mr. M. Catudal, ''I have decided
to give back to uncle my grove. I have decided to make him
a deed of the property, of that property. Uncle is the only
man who has done anything for me in this world. What I
have I will give to him.'' On the day the deed was exe-
cuted he stated to the attorney who drew the deed, Mr.

Emmet Wilson, after referring to the fact that he was going to the sanitarium and to the remote chances that he would ever return therefrom alive, that he had decided to make the deed. He also on this occasion said to Mr. Wilson, "I want you to know why I am doing it, so you can tell them. Uncle has been like a father to me. He raised me and gave me everything I have, and provided the money to buy this ranch, and provided the money to bring it into a productive orange orchard; nobody else in the world has ever done anything for me, and as long as the place came from him that way I want it to go back to him." The deed was then drawn by Mr. Wilson, and on the same day it was signed and acknowledged by Clifford and left by him in the office of Mr. Wilson, to be delivered to the respondent. Respondent called for the deed on the day of its execution and had it recorded the next day. On the same day Clifford executed the deed he caused to be transferred to respondent the thirteen shares of stock in the Rivera Fruit Exchange. Clifford had on deposit in the bank something over $1,700. On the morning of the day the deed was drawn, he drew a check for $500 against this account and delivered it to the respondent. At the same time he drew a second check for $1,204.83 in favor of Lou Collette, an uncle of Clifford's and a brother of plaintiff. He gave this second check to Lou Collette with instructions for him to pay his hospital, medical and other expenses. After drawing these two checks there remained about $60 to Clifford's credit in the bank, which amount he said he would retain for his personal expenses. In 1912, Clifford had made his will and left it in the custody of Mr. Wilson. On March 2, 1916, after giving directions to Mr. Wilson to prepare the deed in favor of respondent, Clifford informed Mr. Wilson that he had divided his money between his Uncle Lou (Lou Collette) and Uncle Jim (the respondent) and "that with the money divided that way, and this deed to Uncle Jim, it will dispose of all the property I have. The will you drew for me will not be of any use after this, and I wish you would give it back to me." Thereupon Mr. Wilson took the will from his safe and handed it to Clifford. This was the last seen of the will, and the court found that it had been destroyed and revoked by Clifford on the day it was given to him by Mr. Wilson.

The main contention made by appellants on this appeal is that the evidence is insufficient to support the judgment. Appellants insist, as the uncontradicted evidence in the case shows, that Clifford was indebted to the respondent at the time he executed the deed of March 2, 1916 (part of said indebtedness being secured by a mortgage upon the real property conveyed, the balance evidenced by his unsecured notes), that the sole consideration for said deed, and the sole purpose which actuated its execution and delivery on Clifford's part, and its acceptance by respondent, was the indebtedness due from Clifford to the respondent; that a conveyance executed under such conditions is subject to the close scrutiny of the courts and will be declared to be given merely as security unless it plainly and unequivocally appears to the contrary; and that the facts and circumstances surrounding the execution of the deed in question, viewed in the light of this rule, were such as to establish beyond question the invalidity of this deed as a conveyance of the absolute title to the real property described therein.

There is little or no dispute by counsel of the respective parties as to the law applicable to the facts of this case. [1] It will be assumed by us that all parties agree that under the decisions of the courts of this state, in order to give validity to a deed made by a mortgagor to his mortgagee, it must be shown that "the conduct of the mortgagee was in all things fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears and poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. Where confidential relations . . . exist, the scrutiny is severer than in cases of a different character." (*Bradbury* v. *Davenport*, 114 Cal. 593 [55 Am. St. Rep. 92, 46 Pac. 1062]; *Clarke* v. *Fast*, 128 Cal. 422 [61 Pac. 72].)

[2] There is not, however, such perfect accord between the parties as to the facts of the case, or at least as to the construction to be placed upon these facts. While appellants contend that the sole consideration for said deed was the indebtedness due the respondent, the respondent, on the other hand, claims that said deed was executed by Clifford

in contemplation of death, and as an absolute conveyance
of the title to the property, and as a gift to the respondent;
and that while he hoped and expected that the ranch would
pay the debt he owed his uncle, yet above and beyond this
consideration was the desire on his part to repay the re-
spondent in the only way within his power for the money
expended by respondent in behalf of Clifford, and for the
years of care and kindness bestowed upon him by the latter.
It is evident that both the court and the jury viewed the
evidence in this light. We think the evidence not only sus-
ceptible of this construction, but that it would be difficult
for anyone reading it to draw therefrom a contrary conclu-
sion. A few brief references thereto will, we think, be
sufficient to make this apparent. On the morning the deed
was executed, Clifford told respondent and Lou Collette that
he was going to deed the property back to respondent. He
prefaced these remarks with the assertion, "Uncle, you are
the only man that ever done anything for me." In his con-
versation with his friend, M. Catudal, about a month before
the deed was executed, he said, "I have decided to give back
to uncle my grove. Uncle is the only man who has done
anything for me in the world. What I have I will give
him." And to Mr. Wilson, the attorney who drew the deed,
he said, "You know a great deal of what Uncle Jim [the
respondent] has done for me. Uncle has been like a father
to me. He raised me and gave me everything I have, and
provided the money to buy this ranch, and to bring it into
a productive orchard. As long as the place came from him
that way, I want it to go back to him." On the other hand,
the only reference made by Clifford to his indebtedness to
respondent, as he told his friends and relatives of his inten-
tion regarding the disposition of his orange grove, was that
made in his conversation with the respondent and Lou Col-
lette, when he said, among other things, "The ranch has
depreciated in value and I don't know that you will ever
get your money out of it," but it was in this same conversa-
tion that he had previously said to the respondent, "Uncle,
you are the only man that ever done anything for me."
Clearly indicating on this occasion that he had in mind the
generosity of his uncle toward him and an intention to re-
ward this generosity by conveying to him the property in

question. His reference, at this time, to his indebtedness can well be accounted for by the anxiety he then felt as to whether the ranch, in its then condition, would be sufficient to reimburse his uncle for the money the latter had put into it. The evidence shows that there was some reason for this anxiety in that the river in the near vicinity of the property, during the previous winter, had cut its channel much nearer the property than it had previously been, thus rendering the value of the property less certain. Under these circumstances, it is not strange that Clifford, realizing the large sums of money the respondent had invested in the property, and that the investment had been made wholly for his, Clifford's, benefit, should feel and express some anxiety as to the final outcome of the venture.

There is another series of facts which strongly indicate that at the time Clifford executed the deed he intended it as an absolute conveyance of the title. The court found upon evidence, which we think was sufficient, that Clifford revoked and destroyed his will, which he had previously made. This revocation of his will was evidently made immediately after he had executed the deed and drawn checks for practically all the money he had on deposit in the bank. The orange grove and the money in bank constituted all of the property of Clifford at this time, except the shares of stock in the fruit exchange, which he transferred to respondent along with the orange grove. We can readily infer from this conduct of Clifford that he revoked his will for the reason that he had disposed of all his property, and, therefore, the will was useless. But we are not left to inference in this matter, for at the time he called for the will he stated to Mr. Wilson, "With the money divided that way and this deed to Uncle Jim, it will dispose of all the property I have. The will you drew for me will not be of any use after this, and I wish you would give it back to me." The revocation and destruction of the will under these circumstances tended, at least, to indicate that it was his intention that the deed to his uncle was an absolute conveyance of all his interest in the real property. It appears to us, therefore, that the evidence is clearly sufficient to support the findings of the court that the deed was not given as security but was intended as a conveyance of the absolute title to real property. The

evidence further shows, in our opinion, that the prime purpose of Clifford in the execution of the deed was to make an absolute gift of the property to respondent in grateful remembrance and acknowledgment of a lifetime of care and kindness bestowed upon him by his uncle.

[3] This Clifford had a perfect right to do. He was of lawful age and of sound and disposing mind. The property, subject to the mortgage, belonged to him, and he had a legal right to make any disposition of it as might appear to him to be proper. There is no evidence that any improper or undue influence was exerted over him by the respondent or by anyone else to induce him to execute the deed, and we find no legal reason that would justify a court in decreeing that the deed was anything else than what it purports to be—an absolute conveyance of the real property described therein.

With this view of the case, it becomes unnecessary for us to consider the argument advanced by appellants against the validity of the deed, based wholly upon the assumption that it was executed by a mortgagor to his mortgagee, and that the sole consideration therefor was the indebtedness existing at the date of the execution of the deed. The argument having been based upon a deduction from the facts which, we think, is not justified by the evidence, must fall of its own weight.

[4] Appellants also contend that the court committed error in sustaining objections to three questions propounded to respondent on cross-examination. These questions mainly had to do with prior statements which respondent had made, either in his deposition or at the prior trial of the action. They did not involve any of the material issues in the case. No showing has been made that appellants were prejudiced by the ruling of the court complained of. It further appears that substantially the same questions were asked in different form and answered by the witness. We find no error on the part of the court in its rulings sustaining these objections.

The judgment is affirmed.

Conrey, P. J., and Houser, J., concurred.