[Civ. No. 2445.    Fourth Appellate District.—October 23, 1939.]

S. B. WRIGHT et al., Appellants, v. SECURITY–FIRST NATIONAL BANK OF LOS ANGELES ( a National Banking Association), Respondent.

Morris Lavine for Appellants.

W. C. Shelton and George W. Burch, Jr., for Respondent.

BARNARD, P. J.—This is an action in ejectment involving the title and right of possession of about 1100 acres of land in the San Bernardino mountains. Kate S. Wright having died pending the appeal, the administrator of her estate has been substituted as one of the appellants. For brevity, we will refer to the original appellants and to the respondent bank, although some of the earlier transactions involved were had with its predecessor, the Pacific Southwest Trust and Savings Bank.

Prior to June, 1924, the appellants owned the land in question subject to a $60,000 mortgage in favor of the respondent. They conveyed a one-third interest in this land to one A. J. Wheeler subject to this mortgage. Wheeler owned an adjoining tract of land known as the Heath ranch, which was also subject to a mortgage. In 1924, the appellants and Wheeler, in association with one James M. Oliver, entered into an arrangement to combine the Wright ranch and the Heath ranch, and any adjoining lands that might thereafter be acquired by any of the parties, for the purpose of developing a resort and land subdivision to be known as Wrightwood. To this end the appellants and Wheeler conveyed their respective lands to the respondent and, on June 2, 1924, a trust agreement was executed between the four parties above named, as beneficiaries, and the respondent as trustee and the respondent's banking department as payee.

This trust agreement is quite lengthy and only a portion thereof need be referred to. It recites that the above-mentioned properties have been conveyed to the respondent subject to the mortgages; that Oliver had performed certain services in connection with both of the properties; that the Wrights are entitled to 26/42ds, Wheeler to 10/42ds, and Oliver to 6/42ds, "interest in the trusts and benefits herein and hereby

created"; that the beneficiaries will from time to time borrow further amounts from the payee; that the beneficiaries have mutually agreed that it is for the best interests of all concerned that both properties and any adjoining properties subsequently acquired should be owned, operated, improved and disposed of as one property; that in order to carry out this purpose "to thus combine ownership of all the aforesaid properties . . . and to own, operate and dispose of same as one property" it is agreed that any adjoining property thereafter acquired by any of the beneficiaries shall be conveyed to the trustee; that the trustee paid no consideration for the lands conveyed and to be conveyed; that the conveyances made and to be made were and will be received by the trustee primarily as security for the payment of the Wright mortgage and subsequent advances and for the further "purpose of holding, operating, leasing, selling and conveying said properties", and applying and disposing of the proceeds therefrom, in accordance with the terms of the trust.

The trust agreement then contains twenty-five articles setting forth further agreements of the parties. Among other things, the beneficiaries agree to pay all existing and future encumbrances, all taxes, liens and expenses, and pay for all improvements contracted for or ordered by them. If any improvements promised by the beneficiaries to purchasers of lots are not installed or paid for, the trustee is authorized to install and pay for the same and be reimbursed therefor. The beneficiaries are authorized, with the approval of the trustee, to subdivide any portion of the land and the trustee is to subscribe necessary maps and dedicate to public use appropriate streets and alleys and to make conveyance to purchasers of any lots sold when they are entitled thereto. The trustee is to rent, lease, sell or convey the property or any portion thereof to such persons and at such prices and terms as the beneficiaries or their agent may direct, subject to the approval of the trustee. The agreement recites that the beneficiaries have entered into a written agreement with a sales agent for the subdivision of the first unit of the property and the trustee is to execute contracts of sale upon demand of said agent. Provision is made for further agency contracts in connection with the subdivision of further units of the property. The trustee is to receive and collect all proceeds arising from leases and sales of the trust property and dispose of them in a

designated manner. In the event the interest of any beneficiary is assigned or passes by reason of his death the trustee shall hold said interest for and shall distribute the proceeds to the one entitled thereto. Article XX of the trust agreement contains the following:

"It is distinctly understood that the interest under this trust of each beneficiary hereunder is personal property and that no such beneficiary has any right, title or interest in or to the property covered hereby, and has no right or power to in any manner apply for or secure the dissolution or termination of this trust, or the partition or the division of any of the trust property; the sole right and power of each beneficiary hereunder being to enforce the performance of the terms of this trust, as expressly set forth in this declaration of trust.

"Provided, however, that after the payment in full of the indebtedness secured hereby, if any, and the termination of the agency appointment or appointments, if any, made in accordance with the terms of this trust, the beneficiaries of this trust by a written direction of a majority in number (and not in interest), may close and terminate this trust."

The original mortgage for $60,000 given by the appellants to the respondent was subsequently paid and released. As contemplated by the trust agreement and in connection with the development of Wrightwood, the respondent advanced large sums of money to the beneficiaries. In 1928 these advances amounted to $197,331.23 and the four beneficiaries executed a note for that amount to the respondent, which note recited that each beneficiary pledged to the respondent as collateral security for the payment of the note "all my right, title and interest in and to" this declaration of trust "and also all my right, title and interest in and to the proceeds and avails thereof". The note also provided that the respondent might sell the pledged property at public or private sale, as it might see fit. In the next few years the four beneficiaries executed seven other notes in various amounts, containing the same provisions. The principal of these notes totalled $263,-331.23. Certain amounts were paid thereon, so that in 1934 the total indebtedness amounted to approximately $220,000.

On March 15, 1934, the respondent brought an action in the Superior Court of Los Angeles County against the appellants,

the other signers of these notes, and certain subsequent pledgees of the beneficial interests in the trust. The complaint was labeled "Action to Foreclose a Pledge". Among other things, the complaint alleged that the signers of the various notes had pledged their "entire beneficial interest" in and to the trust here in question as security for the payment of the notes and that the notes provided that said pledge was made upon the agreement that in the event the indebtedness was not paid as agreed the respondent should have the right to sell the pledged beneficial interests in this trust "as personal property". Among other things, it was prayed that each of the defendants be foreclosed of all "right, interest, claim, lien and/or equity in or to the pledged property, to-wit, the beneficial interest in and to" the declaration of trust here in question "together with the property therein described". It was then prayed that the pledged property be sold in the manner provided by law for the sale of pledged personal property in a court action. The appellants were served and filed an appearance in that action but filed no answer. The court found, among other things, that the entire beneficial interest in this trust "is personal property and it was duly pledged as personal property to secure the respective indebtedness of the defendants". Judgment was entered for approximately $221,000 and a commissioner was appointed to sell all of the property mentioned in the complaint in the manner provided for the sale of pledged personal property. The commissioner reported to the court that he had sold the property to the respondent for about $217,000 and that the balance still due and owing on the judgment was $4,500.

The appellants in this action filed notice of appeal from the judgment and decree in the Los Angeles action. Subsequently, the appellants and respondent in this action entered into a written agreement whereby the respondent agreed to pay to the appellants the sum of $300 and to release the appellants from any and all claims and demands it had against them, and the appellants agreed in consideration thereof and of "other good and valuable consideration" to release and discharge the respondent "from any and all claims, and demands of any nature or kind", to dismiss their appeal in the Los Angeles action, to "waive any and all claim in and to any property, real and personal, a part of the *corpus*" of the trust here in question and "also do hereby transfer and con-

vey, remise, release and forever quitclaim unto" the respond-ent "all of their right, title and interest, if any, in and to the said property, and in and to any reservations, conditions, easements, rights of way or other interest in anywise affecting the title or possession of said property". The agreement then proceeds: "It is the intention of the parties of the first part to quitclaim, and they do hereby quitclaim to said second party, any and all of their right, title and interest, if any, in and to the property, a part of the *corpus* of" the trust here in question. After the execution of this agreement the appeal in the Los Angeles action was dismissed, the respond-ent entered into possession of the land, and the respondent paid the $300 to the appellants and also executed a contract to a third party for another purpose, the appellants having been trying to assist said third party in obtaining such a con-tract.

About a year and a half later the appellants brought this action in ejectment. The complaint alleged that at all times since June 2, 1924, the appellants have been "seized in fee of said real property", and that they were in possession until June 1, 1934, at which time the respondent wilfully and un-lawfully entered upon the property and ousted and ejected them. An amended complaint in ejectment was filed alleging the same things and containing a second cause of action in which it was alleged that the above-mentioned agreement, by the terms of which the appellants agreed to dismiss the appeal in the Los Angeles action and to quitclaim to the respondent the lands included in the *corpus* of the trust, was obtained by fraud and misrepresentations and that the appellants in-tended thereby to agree to dismiss the other action but did not intend to quitclaim their interest in the lands conveyed in trust and did not know that such a quitclaim provision was included therein. The respondent answered denying the alle-gations of the amended complaint and setting up various de-fenses, among which were that the action was barred and the appellants estopped by the final judgment in the Los Angeles action and by the quitclaim provisions of the agreement, and that the appellants were estopped by their grant deed, the declaration of trust and the assignment and pledge of their entire beneficial interests in the trust. The court found in all respects in favor of the respondent, finding upon ample evi-dence that there had been no fraud or misrepresentation in

connection with the execution of the settlement agreement through which the appeal in the former action was dismissed and the property quitclaimed to the respondent. It was further found that under the trust agreement the beneficial interest of each beneficiary was personal property and that no beneficiary had any right, title or interest in and to the property conveyed in trust; that the appellants had pledged their entire beneficial interests in the trust as well as in the proceeds and avails thereof as a pledge of personal property; that the property so pledged was sold pursuant to the decree in the Los Angeles action, by virtue of which the respondent became the owner of all of the real property; that at no time since said sale had the appellants offered to pay the amount due or to do equity; that the appellants had executed an agreement quitclaiming and conveying to the respondent any and all interest they might have in and to the property; that at the time said agreement was executed the said appellants were represented by three attorneys, each of whom advised them to execute the agreement; that by reason of the judgment entered in the Los Angeles action the appellants are barred and estopped from maintaining this action; that the compromise agreement and quitclaim is in full force and effect, has never been rescinded and was not obtained by any fraud whatever; and that by reason of said quitclaim the appellants are barred and estopped from maintaining this action. A judgment was entered in favor of the respondent and this appeal followed.

The appellants contend that the conveyance of this property in trust to the respondent was an equitable mortgage, relying upon *Sacramento Bank* v. *Alcorn*, 121 Cal. 379 [53 Pac. 813]. In that case, it was pointed out that where the effort to create a trust failed it would seem to follow that the instrument was a mortgage. It is next argued that since this was a mortgage the appellants, as mortgagors, have the right of possession until that right is divested as provided for in the case of real property, citing *Bank of Italy Nat. T. & S. Assn.* v. *Bentley*, 217 Cal. 644 [20 Pac. (2d) 940], which case involved an ordinary trust deed. It is then contended that the appellants, as trustors, occupied the dual position of beneficiaries under the trust and of mortgagors under an equitable mortgage, that these two interests were entirely separate and distinct, and that their interest as mortgagors was unaffected by

their pledge and assignment of their beneficial interest in the trust, by the subsequent sale under that pledge, and by the judgment in the other action. In this connection it is argued that the appellants believed, and had a right to believe, that by the foreclosure and sale of their beneficial interest in the trust ''they would be protected in their ownership of the real estate which they had deeded to the bank as a security; that the notes to secure which the deeds were made would be paid and satisfied; that their property would revert to them free and clear''. It is further contended that the right of possession of the real property was not involved in the Los Angeles action, that the judgment therein has no effect in this action, and that the quitclaim given to the respondent is null and void because the respondent failed to prove that it paid the appellants the full value of their equity.

The first question naturally suggested is whether the interest of the appellants, as trustors, in the real property thus conveyed in trust was personal property or whether they retained an interest in real property which could only be divested as such. While it is well settled that the grantor in an ordinary trust deed given to secure a debt retains an interest in the real property it is also well recognized that a different situation may exist where property is conveyed under certain trust provisions and for other purposes. It has been held that whether such trust property is to be considered as personalty or as an interest in real estate depends upon the intention of the parties and, in various cases, certain things have been held sufficient evidence of an intention to convert an interest in real property into one in personal property.

The appellants argue that *Janes* v. *Throckmorton*, 57 Cal. 368, *Title Ins. & Trust Co.* v. *Duffill*, 191 Cal. 629 [218 Pac. 14], and *Lynch* v. *Cunningham*, 131 Cal. App. 164 [21 Pac. (2d) 154, 973], are controlling in the instant case upon this question. In the Janes case land was conveyed to another in trust with directions to sell within three years enough of the land to pay the grantor's debts and then to reconvey to him a part of the remainder. The court pointed out that it was manifestly the hope and intention of the grantor to pay the debts by selling a part of the land and to retain the remainder, and held that he retained an interest in the land. In the Duffill case it was held that a trust created by a certain will gave a present rather than a future interest in real property

to a beneficiary. The trust was to continue until a certain person reached, or would have reached if he had lived, the age of 21 years. In the Lynch case the property was conveyed to a trustee to manage and pay over the income to the beneficiaries for a period of 20 years, the property then to be reconveyed.

The respondent relies on *Ward* v. *Waterman*, 85 Cal. 488 [24 Pac. 930]; *Craven* v. *Dominguez Estate Co.*, 72 Cal. App. 713 [237 Pac. 821]; *Finnie* v. *Smith*, 83 Cal. App. 707 [257 Pac. 866]; *Houghton* v. *Pacific Southwest T. & S. Bk.*, 111 Cal. App. 509 [295 Pac. 1079]; *Smith* v. *Bank of America etc. Assn.*, 14 Cal. App. (2d) 78 [57 Pac. (2d) 1363]; *Bank of America Nat. T. & S. Assn.* v. *Sparr R. Corp.*, 20 Cal. App. (2d) 10 [66 Pac. (2d) 476]. These cases all involve subdivision and sale trusts and in each case it was held that the grantor had retained no interest in the real property but as beneficiary owned merely an interest in the proceeds from the sale of the property, which interest was to be considered as one in personal property.

The appellants argue that the cases last cited constitute the only exception to the rules established by the cases relied upon by them and that the subdivision trust cases establish the rule that in order to change an interest in land conveyed to such a trust into an interest in personal property it must be mandatory, under the trust agreement, for the trustee to sell all of the real property in any event, and there must be no power of termination of the trust or contingency upon which any part of the land may be returned to the grantor. Some of these cases contain language tending to support this contention. For example, in *Bank of America etc. Assn.* v. *Sparr R. Corp., supra,* it is said: "In both the Cunningham and the Duffill cases the reconveyance of the *corpus* appeared to be within the contemplation of the parties involved in the transaction. In the case at bar that intention appears to us to be entirely absent. Not a single one of the trusts indicates any contemplation that the real property should ever be returned or reconveyed to the beneficiary; that the interests of the beneficiary consisted solely in what the surplus might be." However, the court had just pointed out that in both of those cases the rights of third parties were being considered and not merely the intention of the parties to the trust. The appellants' statement that not one of the above cited subdivi-

sion cases involved a trust agreement which permitted any part of the land to be returned to the trustor is not quite true. In *Smith* v. *Bank of America etc. Assn., supra,* the trust agreement provided that the trust might be closed by the conveyance of any unsold portions of the property to the beneficiaries, but it further provided that the interest of each beneficiary was personal property and not an interest in the property conveyed to the trust. Although the interest of a creditor was being considered, it was held that the beneficiaries had no interest in the real property. In that case, the court said: ''Appellant goes to some length to differentiate between the 'title' to the property and the 'estate' in the property. In this regard one must differentiate between a trust established for a perfunctory purpose only, and one established with authority in the *trustee* to alienate the estate and vest title.'' And, also, ''In arriving at a solution of abstract questions and in following the devious courses taken by the title to property involved in various transactions we, however, sometimes lose sight of the full intention of the parties to these transactions. The primary rule in the construction of trusts is that the court must, if possible, ascertain and effectuate the intention of the creator.''

The cases above referred to involve the rights of creditors or third parties. Under such circumstances these cases may be taken as holding that where a trust is created for a limited period or a limited purpose, the grantor retains an interest in the realty conveyed, that a contrary rule may prevail where land is conveyed in trust for the purpose of subdivision and sale, and that in such a case the absence of a power of revocation and of any provision for returning the land to the grantor, is sufficient evidence of an intention to change the interest of a beneficiary from one in real property to one in personal property.

A somewhat different question is here presented where land was conveyed in trust not only as security for a past debt and for contemplated advances in aid of a subdivision scheme, but also to the end that several properties might be owned, improved, subdivided and disposed of as one, and where the controversy is between the trustors and the trustee and the rights and interests of third parties are not involved.

This trust agreement specifically provides that the interest of each beneficiary is personal property and that no such

beneficiary has any right, title or interest in or to the property conveyed. While this seems to have been intended to cover the entire interest of each beneficiary the appellants contend that it did not cover their interest as mortgagors since the conveyance in trust was made partly as security for debts. While the trust agreement recites that the conveyances were made primarily as security for debts and advances and for the further purpose of holding, operating, leasing, selling and conveying the properties, the appellants largely ignore the latter purpose in contending that the trust agreement should be interpreted as creating an equitable mortgage. The trust agreement provides for the making of improvements in furtherance of the purpose of subdivision and sale and contemplates advancements from the respondent, apparently for that purpose. Such advancements were made until the debt amounted to some $263,000. It is fully apparent that this was quite different from the ordinary conveyance given to secure a debt. (*Renton* v. *Gibson*, 148 Cal. 650 [84 Pac. 186]; *Cardoza* v. *White*, 219 Cal. 474 [27 Pac. (2d) 639].) In the latter case the court said: "But the authorities cited . . . go no further than to state the familiar proposition that a deed made *solely* for security will, when attacked by the grantor, be construed as a mortgage in accordance with the real intent of the parties." The improvement and sale of this land and the securing of advancements to aid therein was one of the main purposes, if not the main purpose, of this trust. An existing contract with a subdivider was recognized and it provided that other such contracts might be made. The only material difference between this trust agreement and those considered in the subdivision cases above noted is that it was here provided that the trust might be terminated after all debts had been paid and all subdivision contracts had been ended, in which event any unsold land would be returned to the beneficiaries, and not to the grantors. In a somewhat similar situation, even where the rights of third parties were involved, the court, in *Smith* v. *Bank of America etc. Assn.*, *supra*, held that the beneficial interest of the trustors was personal property and said: "It is made quite clear from the trust agreement itself that during the life of the trust the entire title and estate is in the trustee."

Not only are the rights of third parties not involved here but the parties have clearly expressed the intention that the

trustors shall have no right, title or interest in the property conveyed and that their interests under the trust shall be considered as personal property. In *Smith* v. *Bank of America etc. Assn., supra,* it is said that such language is indicative of the intention of the parties and that "the intention is the criterion". In *Faires* v. *Title Ins. etc. Co.,* 15 Cal. App. (2d) 350 [59 Pac. (2d) 428], this court said: "The declaration of trust contained the provision that the interest of the beneficiaries should be personal and not real property . . . It is probably true that this affected the conversion of an interest in real estate into personal property." In *Bank of America etc. Assn.* v. *Sparr R. Corp., supra,* in holding that the beneficial interests in the trust were personal property the court, after pointing out that the language of the trust agreement and of the assignments of beneficial interests disclosed such an intention, said: "If the intention of the parties was to treat the beneficial interests as a pledge in the nature of personal property, then and in that event the intention then and there expressed prevails throughout the entire transaction."

That the expressed intention was the real intention of the parties seems more probable since different lands were conveyed to the trust by three of the trustors with the purpose of holding and disposing of them as a unit, and there was not only a fourth beneficiary but the interests of the beneficiaries differed materially from their respective interests in the lands conveyed. In no event would any beneficiary receive back exactly what he had conveyed with deductions for what had been sold.

The subsequent acts of the parties throw further light upon their intention and confirm what seems to have been rather clearly expressed in the trust agreement. To secure notes subsequently given in pursuance of the general plan, the trustors each pledged to the respondent all their interest both in the trust and in the proceeds thereof. They had each agreed that their entire interest in the trust and the *corpus* thereof was personal property, and they again pledged these interests as personal property. This subsequent pledge confirms their previous expressed intention that, at least as between themselves, their interests were to be treated as personal property. The subsequent assignments and pledges referred not only to their interest in the trust but made a

separate reference to their interest in the proceeds and avails thereof. All of their pledges referred to their entire interests in the trust and it is a mere technicality and a play on words to argue that they intended, by the language thus used, to cover merely their interests in the proceeds and to omit and exclude any equitable interest in the *corpus* of the trust estate. Under these circumstances and as between the parties themselves, we think the court was justified in finding that the appellants' entire interest in this trust and in the property constituting the *corpus* thereof was personal property. We find nothing in the cases or statutes cited which would prevent that conclusion under the facts here found.

Aside from the meaning of the provisions of the trust agreement and of the pledges of the beneficial interests therein the question of whether the appellants still possess an interest in the real property is affected by further considerations, including the effect of the judgment rendered in the Los Angeles County action and of the subsequent quitclaim executed by them.

The appellants contend that that judgment is not material here, although all parties here were parties to that action. It is argued that the only issue here is as to the right of possession of the land and that this issue was in no way involved in the former action. However, the question of title is involved here as any rights of the appellants must depend upon whether or not they still have an interest in this land which has not been foreclosed. Whether they retained such an interest depends not only upon a construction of the trust agreement, but upon a construction of the pledge of their beneficial interest therein. In *Price* v. *Sixth Dist. Agricultural Assn.*, 201 Cal. 502 [258 Pac. 387], the court quotes with approval from Freeman on Judgments as follows: "If the existence, validity or construction of a contract, lease, conveyance or other obligation has been adjudicated in one action it is *res judicata* when it comes again in issue in another action between the same parties, though the immediate subject matter of the two actions be different." The court then said:

"In other words, when an issue has been litigated all inquiry respecting the same is foreclosed, not only as to matters heard but also as to matters that could have been heard in support of or in opposition thereto. This rule has been aptly

stated as follows: 'It is important to note in this connection, however, that even though the causes of action be different, if the second action involves a right, title or issue as to which the judgment in the first action is a conclusive adjudication, the estoppel so far as that right, title or issue is concerned must likewise extend to every matter which was or might have been urged to sustain or defeat the determination actually made.' (Freeman on *Judgments*, 5th Ed., sec. 677, p. 1432.) To the same effect see *Sullivan* v. *Triunfo Gold etc. Min. Co.*, 39 Cal. 459. Numerous California cases may be found where this rule has been applied.

"This principle also operates to demand of a defendant that all his defenses to the cause of action urged by the plaintiff be asserted under the penalty of forever losing the right to thereafter so urge them."

Instead of proceeding with an ordinary sale of the pledged property the respondent brought the former action. The pledge agreement had referred not merely to the interest of the trustors and pledgors in the proceeds of the trust, but also to all their right, title and interest in and to the trust itself. The complaint in the former action alleged that the entire interest of the pledgors under the trust agreement had been pledged with the right to sell the same as personal property. Among other things, it was prayed that each of the defendants be foreclosed of all his right, interest, claim, lien and/or equity in and to the beneficial interest in this trust, "together with the property therein described". The appellants were thus advised that a foreclosure of any interest or equity they might have in the property was demanded. They failed to answer and the court found that their entire beneficial interest was pledged as personal property. That the appellants fully understood that the purpose of the other action was to foreclose any possible interest they might have in the real property in question is shown by an affidavit filed by the appellant S. B. Wright in the Los Angeles action in connection with a motion to reopen the same. In this affidavit, he said: "Affiant verily states that the object and purpose of said action was to foreclose affiant's interest and the interest of the other named defendants of all their right, title and interest in said real property known as Wrightwood." There was presented in that action the question of whether the entire beneficial interest of the appellants in this trust was or

was not personal property and pledged as such, and it was further sought to foreclose all of the appellants' interest in this land. The appellants, at least, had no doubt as to what was meant by the reference in the complaint to their entire beneficial interest. If they considered that they had an interest or equity in the land which had not been pledged they then had an opportunity to present such a claim. Under established rules they should be estopped from again litigating that question, and the trial court so found.

Subsequently, the appellants dismissed their appeal in the former action and quitclaimed the land in question to the respondent. At the trial of the present action the appellants contended that this quitclaim was obtained from them by fraudulent representations made by the respondent, that they did not know what was in the instrument, and that they had no independent advice. The court found against them on the issues of fraud on ample evidence, which included evidence that they had read the document and had discussed it with three attorneys who then represented them and who had advised them to sign it. They now contend that the quitclaim was void because they were mortgagors under an equitable mortgage and because, as they say, the respondent failed to prove that it paid, as consideration for the quitclaim, the full value of their equity in the property. The quitclaim was signed on April 30, 1935, about a year after judgment was rendered in the Los Angeles County action. Mrs. Wright testified that she considered the property to have been then worth $500,000, and appellants state that this testimony was not denied. It does appear, however, that this testimony came in incidentally and that the case was tried on the theory that the quitclaim was void, not because of inadequate consideration, but because it was obtained by fraud and the appellants were deceived as to its contents. On April 10, 1934, the appellant S. B. Wright wrote to the respondent, ''Perhaps I should say here that it has been a great relief to me that the Bank brought this action as I believe it was absolutely essential that they should do so to protect itself and all other parties in interest. The Bank has always extended to us every possible accommodation consistent with good banking and for which, of course, we are duly appreciative.'' More than a year later the property was quitclaimed to the respondent. The quitclaim agreement recites a consideration

of $300, which was paid, and "other good and valuable consideration". While we are not informed exactly as to what that other consideration was, it does appear that the respondent released the appellants from the payment of the balance of $4,500 on the judgment on the notes, and also executed a contract to a third person which the appellants were anxious to obtain.

In support of their contention that a fiduciary relationship existed between the parties at the time the quitclaim was signed and that the burden rested upon the respondent to affirmatively prove that it had paid for the mortgagor's equity "what it was worth", the appellants rely upon *Bradbury* v. *Davenport*, 114 Cal. 593 [46 Pac. 1062, 55 Am. St. Rep. 92], *Clarke* v. *Fast*, 128 Cal. 422 [61 Pac. 72], and *Collette* v. *Sarrasin*, 69 Cal. App. 114 [230 Pac. 464]. In the Bradbury case, the complaint alleged that a deed had been placed in escrow to be delivered if a mortgage was not paid within a certain time and it was sought to have the deed construed as an equitable mortgage. A demurrer to the complaint was sustained and on appeal the judgment was reversed on the ground that a sufficient cause of action had been alleged. In a subsequent appeal (*Bradbury* v. *Davenport*, 120 Cal. 152 [52 Pac. 301]), the validity of the deed was sustained upon the findings. In that case, the court quoted from *Watson* v. *Edwards*, 105 Cal. 70 [38 Pac. 527], as follows: "A mortgagor may sell and convey all his right and interest in the mortgaged premises to the mortgagee where the transaction is fair, honest, and without fraud, and where no unconscionable advantage has been taken of his position by the mortgagee. It would be surprising if two men in their senses, and with their eyes open, could not make such a contract." *Clarke* v. *Fast, supra,* involved the transfer of an insurance policy for $5,000 in payment of a debt of $200 under circumstances which were plainly inequitable. In *Collette* v. *Sarrasin, supra,* the court assumed that in the case of a deed made by a mortgagor to his mortgagee it must be shown that the conduct of the mortgagee was fair and that he paid what the property was worth, but refused to go into that phase of the case because it held that the deed there in question was a deed of gift.

While it may be admitted that an adequate consideration must be paid in such a case, what is an adequate considera-

tion must depend upon the particular circumstances involved, as is indicated in some of the other cases in this state. In *De Martin* v. *Phelan*, 115 Cal. 538 [47 Pac. 356, 56 Am. St. Rep. 115], the complaint alleged that land worth $390,375 was mortgaged for $196,000, that plaintiff's equity was worth at least $45,500, that the defendant took advantage of the plaintiff's necessities and offered her $19,000 for her equity of redemption, which she took but would not have taken had he not concealed from her the fact that he was willing to pay her up to $45,500 if he could not procure the conveyance for less. The court held that the complaint did not state a cause of action and held that there was no fiduciary relationship between the parties at that time, saying the defendant had obtained a decree of foreclosure and had postponed the sale pending the negotiations. The court pointed out that the plaintiff was fully aware of the situation and knew all of the essential facts. In *Heney* v. *Heney*, 80 Cal. App. 301 [251 Pac. 841], it is said: ''The rule adhered to in this state is, however, that 'the relation between a mortgagee and mortgagor is not fiduciary'.'' In *Graves* v. *Arizona Central Bank*, 205 Cal. 715 [272 Pac. 1063], the respondent had loaned to one Squier $1500 and taken as security an assignment of a contract under which Squier was buying certain land at a purchase price of $12,000 and upon which $4,000 had been paid. Squier later orally agreed that the assignment should be absolute and the respondent paid $2,000 on the original contract. In speaking of the consideration for the oral transfer the court noted that the respondent had canceled Squier's debt to him, had assumed the further payments on the contract and had prejudiced himself by making such payments, and then said: ''Sufficient facts therefore appear to estop said Squier from asserting any title to said property, equitable or otherwise, as against the claim of respondent.'' In *Tetenman* v. *Epstein*, 66 Cal. App. 745 [226 Pac. 966], the court, after stating that the findings negatived the idea that the deed was executed as a result of fraud and that it was expressly found that the parties at the time of the transfer believed the property to be worth no more than the debt, said:

''The conclusion is unavoidable from these findings that when the deed was executed the interveners were satisfied to secure the cancellation of their debt in that way. Such being the facts the underlying reason for the rule favoring the mort-

gagor's right to redeem has no application if the mortgagor contracted freely; no substantial argument is apparent for limiting his power to contract and relieve himself of a debt through the transfer of a property right.

"But aside from these considerations it will be noted that the actions cited by respondent, and other cases in which courts of equity have shown a willingness to set aside deeds made by mortgagors conveying their equities of redemption to mortgagees have been suits to rescind or to redeem; proceedings in which the mortgagor, though tardy, has either come forward and tendered the amount necessary for redemption, or has sought rescission on the ground of fraud or undue influence or advantage taken by the mortgagee over the mortgagor."

Assuming, but not holding, that a relationship of mortgagor and mortgagee existed here, the rule relied upon by the appellants requires no more than that the transaction by which the mortgagor conveys any remaining equity he may have in the property to the mortgagee shall be fair and upon a consideration which is adequate under the circumstances. What is an adequate consideration must depend upon the facts in each case and is a question of fact for the trial court. The respondent here gave a very substantial consideration for the quitclaim, including $300 in cash, the release of $4,500 further indebtedness, and the execution of a contract which the appellants desired. While the appellants may, in looking back, have considered the property worth $500,000 at the time in question, the general circumstances justified the court in concluding otherwise. With full opportunity to sell the property the appellants had been unable to pay the debt while the respondent carried the loan for ten years. The quitclaim was given more than a year after judgment was entered in the other action. When the cash called for by that agreement was paid on May 14, 1935, after the appeal had been dismissed, the respondent told Mr. Wright that it would sell the property to him, or to anyone, for what it had in it. This action was begun nineteen months later, and there is no evidence that in the meantime, or since, the appellants, or anyone in their behalf, have ever offered to pay that amount and take back the property. Under the circumstances shown by the evidence we are unable to see that the court erred in

refusing to declare the quitclaim void for lack of an adequate consideration.

■ We think the court correctly held that the appellants are estopped from asserting any title to the property, equitable or otherwise, as against the claim of the respondent. It is noticeable that they have never offered to pay the amount of the debt or the amount paid by the respondent at the sale of the pledged property. While the appellants assert that such an offer on their part is not required in this action, being one merely for the possession of the property, the facts remain that the question of the title to the land was actually involved, that the respondent was in possession under a conveyance absolute upon its face, and that in order to recover possession the appellants necessarily sought to obtain equitable relief by having the quitclaim set aside. To secure such relief it was incumbent upon them to comply with and bring themselves within the rules of equity.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 21, 1939. Houser, J., and Gibson, J., did not participate.